**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT AT GREENVILLE TENNESSEE**

FILED

JUL 3 1 2020

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

| | |
|---|---|
| ANTHONY MASINO,<br>**Individually and On Behalf of his Minor**<br>**Children,**<br>　　　**C.M. 1, A Minor Child,**<br>　　　**C.M. 2, A Minor Child,**<br>　　　**and C.M. 3, A Minor Child,**<br><br>　　　　**Plaintiffs,**<br><br>**vs.**<br><br>**EAST TENNESSEE STATE**<br>**UNIVERSITY,**<br><br>　　　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No:

Judge:

**JURY DEMAND**

---

## COMPLAINT

Comes now the Plaintiff, Anthony Masino ("Masino"), individually and behalf of his minor

children, and for cause of action will respectfully show to the Court as follows:

### PARTIES

1.　　Plaintiff, Anthony Masino, is a citizen and resident of Johnson City, Washington County,

Tennessee.

2.　　Masino is the biological father of the Minor Plaintiffs, C.M. 1, C.M. 2 and C.M. 3, ("the

Minor Plaintiffs" or "CM1, CM2 and CM3"). The Minor Plaintiffs are citizens and residents of

Washington County, Tennessee who reside with their father.

3.　　Defendant, East Tennessee State University ("ETSU"), was acting by and through its

agents, servants or employees who were, in turn, acting within the course and scope of their

employment, and submits itself to the jurisdiction of this court by virtue of its location in Johnson

City, Tennessee.

## JURISDICTION AND VENUE

4.      This is an action for due process violations under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; for violations of Title IX, 20 U.S.C. § 1681, et seq.; and for violations of the State of Tennessee's recognized causes of action for Invasion of Privacy False Light, Defamation/Libel, Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress, Intentional Interference with Business Relationships, Intentional Interference with Contractual Relationships and Malicious Harassment.

5.      This court has subject-matter jurisdiction of this action and by virtue of Title IX, 20 U.S.C. § 1681, Title 28 U.S.C. §1331, and 42 U.S.C. § 1983.

6.      This Court is the proper venue in which to adjudicate this action under and by virtue of Title 28 U.S.C. Section 1391(a). The actions giving rise to Plaintiffs' claims were undertaken and initiated within this District and Division. Communications and disclosures relative to actions taken by Defendant involved this District and Division.

## FACTS COMMON TO ALL COUNTS

7.      Masino was a tenured faculty member at ETSU in which Masino had a constitutional property right to his position.

8.      Masino was highly regarded faculty member, with prestigious committee appointments, teaching awards, publications, service honors, research grants and received considerable accolades and awards during his employment with ETSU.

9.      Masino is a male over 40 years of age.

10.      Masino has had sole custody of his three minor children since 2011.

11.      Masino's minor children attend University School which is controlled and operated by ETSU.

12.     Masino contributed to ETSU by serving as a member of the ETSU Faculty Senate Executive Committee. As part of the ETSU Faculty Senate, Masino was known for questioning, in a professional and collegial manner, the potentially unethical and questionable tactics and behavior of ETSU administration.

13.     As part of the ETSU Faculty Senate Masino had a number of interactions with the University's office of legal counsel and on several occasions brought to their attention potential violations of professional and ethical standards of conduct practiced by the University, including conflicts of interest and nepotism.

14.     As part of Masino's duties on the Committee, he was asked to investigate ETSU policies to determine whether changes could alleviate or eliminate allegations of misconduct and litigation costs. Masino recommended a number of policy changes designed to ensure that all parties' constitutional due process rights were protected.

15.     Masino had reported to ETSU President Noland that he had concerns about Ed Kelly, ETSU's legal counsel, particularly that Kelly's hiring and supervision of his daughter, Courtney Kelly gave, at a minimum, the appearance of nepotism.

16.     Members of the ETSU Faculty Senate have historically recommended to ETSU administration that ETSU policies for harassment, specifically PPP-80, should be rewritten to delineate the rights of the parties involved more particularly and ETSU has deliberately declined to do so.

17.     Some recommended policy changes were implemented but policies designed to protect faculty from potential oppressive behavior of ETSU legal counsel office were rejected.

18.     Masino's participation on the Committee and his actions over the course of several years created significant animosity on the part of the legal department toward Masino. (Exhibit A –

Alsop affidavit)

19.     All ETSU employees and staff are eligible to take classes at ETSU. Masino applied for

and was accepted as a student at ETSU.

20.     ETSU withheld approval for Masino's enrollment in courses starting in 2018.

21.     As early as 2014, Troy Perdue, an attorney member of ETSU's legal department, has

been attempting to portray Masino as a sexual predator. (Exhibit B – Salyer affidavit)

22.     ETSU Policy PPP-80, Discrimination & Harassment Complaint & Investigation,

implemented in 2017, did not (and does not) contain disciplinary action for faculty members in

relationship with former students, stating only that the faculty member should report any

potential conflicts and ETSU was to resolve such conflicts. Specifically, the section on

Consensual Relationships in ETSU Policy PPP-80, *Discrimination & Harassment Complaint &*

*Investigation*, states the following regarding relationships between faculty and students:

   a. These [consensual] relationships could lead to undue favoritism or the perception
      of undue favoritism, abuse of power, compromised judgment or impaired
      objectivity.
   b. Engaging in a consensual relationship with a student over whom the faculty
      member has either grading, supervisory, or other evaluative authority (i.e.,
      member of dissertation committee, thesis director, etc.) constitutes a conflict of
      interest.
   c. The faculty member must take steps to remove the conflict by assigning a
      different supervisor to the student; resigning from the student's academic
      committees; or by terminating the relationship at least while the student is in
      his/her class.
   d. Likewise, it is a conflict of interest for a supervisor to engage in a consensual
      relationship with a subordinate over whom he or she has evaluative or supervisory
      authority.

Consensual relationships are not prohibited by ETSU's policy, and no disciplinary action is

called for in the event such a relationship develops.

23.     From July 2016 through November 2016 Masino was dating "Ms. F.".

4

24. In December 2016, after Masino's relationship with Ms. F had ended, a former student ("Jane") initiated a romantic relationship with a Masino.

25. Masino had no grading, supervisory or other evaluative authority over Jane during the time the two of them were personally involved.

26. On a number of occasions Jane disclosed to multiple persons that it was she who pursued a romantic relationship with Masino.

27. Their relationship continued through 2017 and ended in December 2017.

28. Masino has evidence sufficient to prove that Jane committed criminal acts against Masino involving his legally protected private information.

29. In the summer of 2017, the Chair of ETSU's Accounting Department and Masino's immediate superior, Gary Burkett ("Burkette"), notified Masino of an upcoming event which would require Burkette to be out of the office. Burkette informed Masino that Masino would be "Assistant Department Chair" during his absence. Masino declined but the title was nevertheless assigned.

30. Masino disclosed his relationship with Jane to Burkette and his concerns that with the Assistant Chair title, according to ETSU's consensual relationship policy he might now be considered as having evaluative authority over Jane. Burkette informed Masino that Masino was not nor would be in violation of the policy, even with the title change. Masino's proper notification to Burkette and Burkette's response were witnessed by Burkette's executive aide, Ms. Valerie Swartz ("Swartz"). (Exhibit C – Swartz affidavit)

31. During Burkette's absence Masino was never called upon to act as department chair nor did he ever possess any actual evaluative authority over Jane.

32. Masino reasonably relied upon guidance and feedback from his direct supervisor,

Burkette.

33.    Beginning in January 2018, Masino reported to various ETSU personnel, specifically Burkette (Masino's supervisor), Troy Perdue and Ed Kelly (ETSU legal counsel office), that Jane was stalking and harassing him and his minor children and had committed criminal acts against them.

34.    In January 2018 Burkette became aware of Jane's identity and her threatening and harassing activities directed toward Masino.

35.    During their relationship, Jane admitted to Masino that she was mentally unstable. Jane later admitted in deposition under oath that she had indeed made such statements to Masino.

36.    Prior to beginning a personal relationship with Masino, Jane had a close friendship with Masino's adult nieces, who lived with Masino and his minor children. Jane visited Masino's house many times prior to the beginning of their romantic involvement.

37.    Jane and Masino's family became close, particularly Jane and Masino's children.

38.    After their romantic relationship began in December 2016, Masino and Jane attended many events together, took family vacations, made plans for the future and each professed the hope that the relationship would lead to marriage.

39.    Masino's emotional and physical health deteriorated visibly beginning in January 2018 due to Jane's criminal and harassing behavior towards Masino and his minor children. More than one of his ETSU co-workers noticed the dramatic changes.

40.    In February 2018, Masino informed Burkette that Masino was in counseling due to Jane's harassing behavior.

41.    In January and early February 2018 Masino repeatedly reported to Burkette and ETSU legal counsel office that Jane had gained unauthorized access to his electronic accounts and

6

devices, threatened him with such stolen data and requested ETSU's assistance in investigating breaches of confidential data.

42.     Jane admitted under oath in deposition that she had accessed Masino's accounts and devices without permission.

43.     Masino again discussed with Perdue on February 2, 2018, Jane's erratic behavior, threats and disturbing messages. He asked for assistance and a Title IX investigation of Jane due to her unauthorized access to his devices and files and repeated harassment, threats and stalking.

44.     Masino reported to ETSU that he was in fear of his own safety and that of his children, and that he and his children were in therapy because of Jane's activities.

45.     Mr. Perdue told Masino to "keep the peace," and said that ETSU's legal department would initiate an investigation.

46.     Immediately after meeting with Perdue, Masino informed Ms. F of the situation due to Jane's threats to falsely accuse Ms. F as well.

47.     Masino and Burkette met with Perdue the following week to report Jane's behavior towards Masino and Masino's minor children and seek assistance from ETSU to have Jane investigated and Jane cease and desist her harassment and criminal behavior.

48.     No ETSU policy requires that complaints of sexual misconduct be formally put into writing in order to require ETSU to investigate such complaints. According to ETSU policy PPP-80, "supervisory employees must promptly report, to the appropriate institutional contact, any complaint or conduct which might constitute harassment, whether the information concerning a complaint is received formally or informally."

49.     Ed Kelly, Troy Perdue and Gary Burkette are mandatory reporters when given information about sexual misconduct.

50.     Other employees of ETSU were aware of Jane's identity and reported Masino's fear of her behavior to ETSU legal personnel.

51.     Masino reported Jane's behavior to ETSU's Kelly and Perdue and requested an investigation prior to a Title IX charge filed against him by Jane on February 19, 2018.

52.     ETSU had sufficient information to initiate an investigation of Jane prior to Jane's false complaint against Masino. ETSU purposefully and willfully ignored policies and procedures to undermine the credibility of Masino. (Exhibits D & E - Johnson report, RDS report).

53.     Third parties filed notice of complaint against Jane to which ETSU ignored those complaints as well.

54.     On the advice of Perdue, Masino went to ETSU Campus Police prior to Jane's complaint to ETSU, specifically Lt. Michael Orr, to report Jane's criminal activity and to obtain ISP login information.

55.     Masino met with Lt. Orr regarding unauthorized access and threats made by Jane. He asked for computer data through 2017. Lt. Orr indicated that ETSU would seek the requested information.

56.     Lt. Orr noticed that Masino was shaking while describing his fear and asked if Masino wanted a campus counselor to come sit with him.

57.     ETSU police failed to investigate Masino's claim that Jane had gained unauthorized access to his electronic files and devices despite being given proof by Masino of her unlawful access.

58.     ETSU failed to view Masino's reports of Jane's misconduct as credible and made no effort to determine whether the complaints had merit.

59.     On February 9, 2018, prior to her complaint against Masino, Jane gained unauthorized

entry to Masino's house in which she threatened and sexually assaulted Masino and threatened his children and a houseguest.

60.     By this point ETSU should have informed Jane that Masino had made a Title IX complaint about her and should have issued a no-contact order but neither of those things had happened.

61.     Despite ETSU's lack of appropriate notification and a failure to issue the no-contact order, Jane nevertheless told Masino on the night of February 9th that she knew he had reported her misconduct to ETSU legal department.

62.     There are audio and video recordings of Jane's invasion of Masino's home.

63.     While Jane was at Masino's home on February 9th, Burkette called Masino and heard screaming in the background. Burkette sent Masino text messages after the phone call, concerned about the safety of Masino and Masino's children.

64.     Jane refused to leave the property and the local police were called.

65.     Masino contacted the ETSU legal department on February 10, 2018 to update his previous complaints and notify ETSU of Jane's criminal behavior on February 9, 2018.

66.     On February 10, 2018 Masino showed a copy of the Johnson City Police Incident Report to his coworkers Burkette and Michelle Freeman.  Masino informed both parties he was in fear of his safety and safety of his minor children. Burkette informed Masino that Burkette had already spoken with ETSU legal and was not to discuss the matter any further with Masino.

67.     Masino repeatedly requested safety measures out of fear of Jane and asked that he be removed from any event in which Jane wished to participate.

68.     Jane initiated contact with ETSU's legal office on February 11, 2018, reporting to ETSU *for the first time* that she had issues with Masino.

69.     On February 12, 2018 Masino again contacted ETSU legal via Perdue to update him on his complaint and desire to seek a restraining order against Jane. Perdue told Masino to come in at 2 pm. When Masino arrived, he was informed that Jane had contacted their office with complaints about Masino.

70.     Perdue and Kelly made derogatory comments to Masino regarding his personal life and his status as an attorney.

71.     Masino was informed by Kelly and Perdue on February 12 that Jane had made numerous allegations against him, including sexual misconduct, and also about conduct outside of ETSU's authority to investigate. Perdue and Kelly informed Masino that:

    a.    They would deny that Masino had previously notified various responsible parties of Jane's behavior.
    b.    Any action by Masino either investigating or seeking a just outcome against Jane would be considered retaliation and would be grounds for Masino's termination.
    c.    He should resign immediately, or he would be found guilty of Jane's charge.
    d.    ETSU would smear him publicly by using the media.
    e.    Their findings could adversely impact his child custody agreement.
    f.    ETSU would take steps to negatively impact Masino's professional law and CPA licenses.
    g.    They planned to tell people that Masino had manipulated Jane for sexual reasons.
    h.    They would investigate him for the practicing law in Tennessee without a license.
    i.    They would investigate him for conducting non-ETSU business from his ETSU office.
    j.    ETSU would assist Jane so that Jane could sue Masino in the future.
    k.    They would paint him as a serial groomer and a predator, a narrative they had tried to pursue since 2014.

72.     When Perdue and Kelly were questioning Masino about Jane's allegations on February 12, they asked Masino, "Don't you wish there were other attorneys sitting in these chairs?" implying that all of them understood Perdue and Kelly's predisposition of bias against Masino.

73.     Masino attempted to contact ETSU President Brian Noland about his complaints against Jane and the misconduct of ETSU's legal department but was denied access to Mr. Noland.

74.     Masino retained legal counsel, Donald Spurrell, to represent him due to the threats of

retaliation by Kelly and Perdue. Spurrell arranged a meeting with Kelly, and Kelly repeated the same threats and allegations that Masino had attributed to Kelly and Perdue. Later Lisa Williams, a staff attorney working for Kelly, repeated the same threats of retaliation. (Exhibit F – Spurrell affidavit)

75.     On February 12, 2018 Masino informed Burkette and others of retaliation threats made to him by ETSU's Perdue and Kelly.

76.     Masino requested that all interviews, with all parties and witnesses, be recorded.

77.     During the course of the investigation of Jane's Title IX complaint against Masino, only Masino's interview was recorded.

78.     After the February 12 meeting between Masino, Kelly and Perdue, Perdue sent Masino three emails asking Masino if he recorded the conversation with Perdue, Kelly and Masino. Perdue refused to answer any of Masino's questions until Masino responded about a potential recording.

79.     On February 19, 2018, Jane filed a Title IX complaint against Masino with ETSU.

80.     Jane used and influenced other people to trick Masino, gather information about him, and manipulate him.

81.     ETSU knew or should have known that Jane's credibility is disputable and problematic.

82.     ETSU knew or should have known Jane's assertions were inconsistent and contradictory on key points.

83.     Jane's Title IX charge against Masino was rife with factual errors, unsupported conclusions and subjective opinions.

84.     Jane told Masino that she intended to, among other things:

        a. Ruin Masino personally and professionally;
        b. Negatively impact Masino's custody of his minor children;

11

     c. Negatively impact his professional licenses;

     d. Disclose Masino's confidential files to third parties;

     e. Falsely accuse Masino of relationships with other female students;

     f. Impact the estate and trust set up by Masino's mother in which Masino was executor and trustee;

     g. Falsely accuse Masino of a relationship with a former, graduated student who acted as a nanny for Masino.

     h. Use data obtained illegally from Masino's electronic files to harm Masino's reputation;

     i. Take advantage of the known animosity of ETSU legal office against Masino;

     j. File false allegations of unlicensed practice of law;

     k. File false allegations of running a business using ETSU resources;

     l. File a false allegation that Masino was colluding with other faculty members to give her failing grades (which she never received);

     m. File a false allegation that Masino was precluding her from being admitted into a course;

     n. File a false allegation that Masino pursued her; and

     o. Make false allegations that Masino gave Jane his personal prescription medications.

85. ETSU failed to follow federal law and their written policy, PPP-80 – Discrimination & Harassment. Section B.3.b states, "However, when the Complainant chooses not to provide or sign a written complaint, the matter will still be investigated, and appropriate action taken."

86. Perdue and Kelly have denied that Masino had notified any responsible party, including members of ETSU's legal department, of Jane's behavior before the February 12, 2018 meeting. (Exhibit D – Johnson Report).

87. ETSU failed to inform Masino of his protected rights under *Garrity v New Jersey,* 385 U.S. 493 (1967). "There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. *Garrity v. State of N.J.*, 385 U.S. 493, 500, 87 S. Ct. 616, 620, 17 L. Ed. 2d 562 (1967)

88. ETSU violated Masino's rights under *Garrity* by threatening termination if he exercised his free speech rights.

89. On February 19, 2018, prior to filing her formal Title IX complaint against Masino, Jane stood outside Masino's children's school and made offensive gestures to Masino and his children

as Masino dropped them off at school. Masino reported the behavior to ETSU campus police who refused to interview Masino's children who witnessed the event. Later that same day, Jane met with ETSU personnel to file her complaint.

90.     ETSU provided material assistance to Jane in order to support her charges against Masino.

91.     Jane's allegations contained multiple unwitnessed and unsupported interactions with Masino, along with rebuttals of issues Masino had reported to ETSU about her even though she would have had no way of knowing what Masino had reported.

92.     All of Jane's accusations and assertions were taken as true by ETSU from the moment she made them, even though she presented no proof or evidence in support of her allegations.

93.     Jane's charge against Masino is replete with admissions that she did not report her misgivings to anyone until February 2018 (after her coordinated home invasion and sexual assault against Masino), and her statements, although colored in a different light, support Masino's assertions.

94.     It is evident that Jane had help writing her charge. Refutations of Masino's allegations are offered, even though she had no reason to know what he had reported to ETSU. Certain statements which would be considered crucial to a valid charge are in highlighted and bold font, something a typical undergraduate student would have no reason to know to emphasize.

95.     Her statements include information dated years before meeting Masino, inferring misconduct between Masino and a friend, a relationship about which she knew nothing. The allegations cast Masino in a bad light, and support Masino's assertions that Jane had gained unauthorized access to Masino's files.

96.     On February 14, 2018, Masino was given a no-contact order severely restricting him or

his representatives from communicating with current or former students, teaching classes, and other on-campus activities. This directive made it impossible for Masino to formulate a proper defense of the charges against him.

97.     No such restrictions were placed on Jane, leaving her free to conduct any interviews or gather any information in an attempt to support her claims against Masino.

98.     During the investigation and afterward, Jane continued to harass and stalk Masino, his family, and Masino witnesses both on and off campus. ETSU was made aware and did nothing. ETSU intentionally and willfully ignored third party complaints and notices against Jane to undermine Masino credibility.

99.     Jane *never* produced any evidence that her educational experience was negatively impacted by Masino's alleged conduct. She graduated on time without obstacles.

100.     ETSU opened an ancillary investigation into Masino's activities unrelated to the charge filed by Jane, including issues for which they had no standing to investigate.

101.     Masino's former wife, Ms. N, reported to ETSU that she had been contacted by Jane and that Jane had suggested that in exchange for Ms. N's cooperation in ETSU's investigation against Masino, Jane would assist her in regaining custody of her children.

102.     Reports made to ETSU by Ms. N regarding Jane's behavior were ignored.

103.     ETSU made defamatory statements about Masino to many people, including Masino's own associates and witnesses.

104.     Masino was and always had been a person of good name, credit and reputation in the community. The intentional, malicious, reckless, and/or outrageous behavior of ETSU has diminished Masino's good name and reputation.

105.     Masino is a licensed attorney and a CPA in more than one jurisdiction subject to

professional ethics and moral turpitude requirements.

106.   As a licensed attorney and licensed CPA, Masino's reputation for being truthful and law-

abiding is extremely important.

107.   During their investigation of Masino, ETSU has done but not limited to the following:

    a.    Lied and misled witnesses in an attempt to gather information against Masino.
    b.    Defamed and slandered Masino to gather negative information against Masino (known as bias confirmation).
    c.    ETSU's legal counsel contacted Masino's former spouse in an attempt to further defame and torment Masino.
    d.    ETSU asked third parties questions ETSU had no legal authority to ask in an attempt to damage Masino's reputation.
    e.    ETSU purposefully ignored and failed to contact third party witnesses who could provide exculpatory evidence to Masino and/or damaging evidence against Jane.
    f.    Lied to and misled a third party who has self-admitted mental health issues. The third party began to stalk, threaten, harass Masino and his minor children based on the lies communicated by ETSU's legal counsel office to the third party. ETSU knew or should have known lying and misleading parties would place Masino and his minor children in harm's way and subject them to distress.
    g.    Blocked Masino's ability to ensure exculpatory evidence was not destroyed by third parties.
    h.    Allowed the destruction of key evidence by third parties.
    i.    Advised third parties to contact a news reporter who was an adjunct faculty member and whose wife worked for ETSU in the public affairs office.
    j.    ETSU has coached, advised and assisted third parties to obstruct discovery of ETSU's misbehavior and potentially illegal behavior.

108.   Upon information and belief, ETSU's behavior and comments were done intentionally as

retribution for Masino's previous disclosures of ETSU's illegal and unethical practices.

109.   ETSU utilized the one investigator model in contradiction to US Department of

Education mandates.  ETSU found Masino responsible for misconduct against Jane.

110.   Masino's appeal of the investigation results was denied although overwhelming evidence

showed misconduct by ETSU personnel and coercion by ETSU legal counsel office personnel.

111.   Upon information and belief, ETSU had no intention of following federal and state

guidelines to conduct an impartial and unbiased investigation of Masino.  ETSU legal personnel

and President Noland informed third parties Masino would be found guilty before even initiating

the investigation.

112. Upon information and belief, ETSU conspired to assist the harassment, stalking, defamation, and/or terrorize Masino.

113. Masino's tenure and employment were terminated by ETSU as of July 31, 2019.

## COUNT I – BREACH OF CONTRACT

114. All preceding paragraphs are incorporated herein as if repeated in their entirety.

115. A contract was formed between ETSU and Masino; either an express contract or a contract implied in law or fact.

116. Masino was a tenured professor at ETSU. Tenure is a contract that requires cause before a professor can be terminated prior to the end of his/her tenure term.

117. ETSU conducted tenure termination proceedings against Masino as a consequence of their finding that he was responsible for misconduct against Jane.

118. By failing to conduct a fair and unbiased investigation of the charges filed against Masino by Jane, ETSU's grounds for terminating Masino prior to his tenure end constituted a breach of contract.

119. Masino had the reasonable expectation that ETSU would implement and enforce applicable federal law and the promises and policies made in its official publications.

120. The contract contained an implied covenant of good faith and fair dealing and other specific written provisions from written policy and other rights guaranteed by law.

121. Certain rights were and are guaranteed to every student and employee at ETSU involved in the disciplinary process, including those accused of sexual misconduct or assault.

122. Specifically, Defendant ETSU is accused of the following breaches:

      a. ETSU failed to take into account the totality of all evidence available, *from all relevant sources*, for which Masino was disciplined. ETSU's failure to properly

investigate the allegations violated their policies and the law and constitutes a breach of contract.

b. According to ETSU policy, gender-based misconduct hearings ... must be conducted in a manner consistent with ETSU policies and *transparent to the accuser and accused.* There was nothing transparent about the investigation of Jane's allegations against Masino. Masino was not given access to the identity of Jane's witnesses, nor their statements, preventing him from cross-examination or preparing any necessary rebuttal statements.

## COUNT II – TITLE IX VIOLATIONS

123. All preceding paragraphs are incorporated herein as if repeated in their entirety.

124. Beginning in January 2018, after their relationship ended, Masino repeatedly asked Jane to leave him alone.

125. Also, in January 2018, Masino reported to ETSU personnel, including staff in the Legal department, that Jane was stalking and harassing him, and had committed criminal acts against him. She used their sexual relationship in her threats. He requested that ETSU investigate Jane as a sexual harasser under Title IX and ETSU policies.

126. In order to request an investigation of her, it was necessary for Masino to release Jane's name to ETSU which he did in January 2018.

127. ETSU was aware of her identity and there were no barriers to conducting a Title IX or other investigation of Jane based on Masino's reports.

128. Burkette admitted to knowing Jane's identity in late January 2018 and latest on February 6th, 2018.

129. Members of ETSU's legal staff neither acknowledged the deterioration in Masino's health nor did they give consideration to the statements given by witnesses attesting to the decline in his health, behavior, and demeanor arising from the harassment, threats and stalking of Jane towards Masino.

130. Witness statements that supported Masino and his version of events were ignored by

ETSU.

131.    More than one ETSU employee felt pressured and intimidated by ETSU legal counsel, believing their jobs could be in jeopardy for not supporting ETSU's version of events.

132.    Masino requested that ETSU investigate Jane's sexual harassment and stalking of Masino, including her admitted criminal behavior invading his privacy.

133.    Masino requested that the University investigate Jane's actions harassing and threatening behavior toward his children at the University school. ETSU failed to investigate or take any remedial measures.

134.    20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available." *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). Standard of Review: A Title IX claim must allege specific facts that support a minimal plausible inference of discrimination in order to plead sufficiently the required element of discriminatory intent. This is the standard applied in Title IV employment discrimination cases addressing what it required of plaintiffs. *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

135.    ESTU's failure to conduct a proper Title IX investigation regarding Jane's charges against Masino took the following forms[1]:

    a.    Masino was never shown any evidence submitted by Jane, collected by ETSU, or statements of witnesses testifying on behalf of Jane prior to the Final Report ("Report") where Masino had already been found responsible for misconduct.

    b.    Only Masino was severely restricted from communicating with students and other campus activities. This improperly interfered with his ability to have full access to University facilities and activities and forced him to be continually on guard as to whether Jane may be anywhere where he may have "incidental" contact with her.

    c.    The restrictions made it impossible for Masino to contact supportive witnesses or gather evidence in his own defense.

    d.    Never having seen any evidence or witness statements supporting Jane's charges, assuming any such evidence existed, Masino was unable to provide a response to

---

[1] ETSU's investigative errors are not limited to those enumerated in this complaint.

the evidence against him prior to his appeal of the Report.

- e.  Masino was never permitted any form of cross-examination of Jane or any witnesses she claimed supported her charge, violating his due process rights.
- f.  Upon information and belief, Masino asserts that Jane was shown statements and evidence submitted by Masino and his witnesses, without giving Masino the same access.
- g.  ETSU was selective in interviewing witnesses provided by Masino, picking and choosing whose statements supported their desired outcome.
- h.  Statements by several witnesses who spoke on Masino's behalf were conspicuously absent from the final report.
- i.  ETSU's Report shows that ETSU considered a great deal of unrelated and irrelevant information, written in a manner that casts Masino as guilty.
- j.  Exculpatory information and information supporting Masino's position discovered in the investigation was ignored by ETSU when passing judgment.
- k.  By the time the Report was issued, Masino had no opportunity for response as he had already been found responsible for misconduct.
- l.  The Report finding Masino responsible was signed by both Kelly and Kelly's daughter, Courtney Kelly. The same parties who Masino had reported for violating state nepotism laws.

## A.  Erroneous Outcome

- a.  Masino has facts sufficient to cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding as no exculpatory evidence or evidence favorable to him was considered.
- b.  Upon information and belief, ETSU records will show a particularized causal connection between the flawed outcome and gender bias.
- c.  The standard of a preponderance of the evidence used by ETSU, from obsolete direction given in the "Dear Colleague" letter of 2011, was never met. Both parties have given conflicting testimony. There is nothing in the record to suggest any reason why Jane was deemed more credible than Masino. Witness statements and police reports support Masino's credibility while evidencing lack of Jane's credibility.
- d.  Masino asserts that ETSU found Jane to be more credible simply because she is a female and he is a male, and that in actuality, Jane is less credible due to the inconsistency of her statements throughout the investigation.
- e.  ETSU relied on Kelly and Kelly's daughter, Courtney Kelly, in the investigation. The policy Masino was found responsible for violating is signed by both even though ETSU was aware of conflict of interest and bias towards Masino.

## B.  Selective Enforcement

- a.  Upon information and belief, ETSU records will show a higher percentage of "responsible" findings against males than females.
- b.  ETSU provably chose to investigate Jane's Title IX complaint against Masino and not to investigate Masino's Title IX complaint against Jane.
- c.  ETSU issued only one no-contact order which constrained the activities of

Masino and not Jane.

d.      ETSU deliberately chose not to investigate or take any action when Masino reported conduct against his children at the ETSU University school.

## C. Deliberate Indifference

a.      By failing to investigate Masino's claims against Jane, and by failing to consider evidence provided by Masino or interview any of Masino's witnesses, ETSU had authority to institute corrective measures, and was deliberately indifferent to the misconduct."

b.      By permitting violations of ETSU policy, known to ETSU investigators, ETSU objectively barred Masino's access to his educational opportunities and benefits." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); see also *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 444–45 (6th Cir. 2009).

c.      ETSU, recipients of federal funds and thereby state actors, had actual knowledge of the policy violations to constitute "notice" that the proceedings were not fair, unbiased or transparent.

d.      Masino has alleged facts showing a potential pattern of gender-based decision-making that raise a reasonable expectation that discovery will reveal circumstantial evidence of gender discrimination.

e.      Masino has created a plausible inference of intentional gender discrimination, sufficient to seek further evidence through the discovery process. *Southfield Ltd. P'ship v. Flagstar Bank*, F.S.B., 727 F.3d 502, 505 (6th Cir. 2013)

## D. Archaic Assumptions

a.      The Sixth Circuit has clearly established that where, as here, credibility is at stake, in that one party maintains that the sexual encounter was consensual and the other says it was not, a live hearing in front of the ultimate fact finder, with some form of cross-examination is required. *Univ. of Cincinnati*; 872 F.3d at 396, 401-02; *Masino v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018).

b.      ETSU viewed Jane as truthful when no objective evidence made her testimony or her witnesses more credible than Masino's. Given the climate of #MeToo, women are automatically assumed to be telling the truth when accusing a male of sexual misconduct.

## E. Hostile Environment

Masino has shown that his investigative experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). (Exhibit D & E – Johnson Report, RDS Report)

## F. Section 1983

School officials are state actors claims pursuant to 42 U.S.C. § 1983 against the individual defendants in their official capacities. In Masino's case, ETSU investigators

violated Masino's Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Considering the claims in the light most favorable to Masino, the facts are sufficient to establish the deprivation of a right secured by the Constitution or laws of the United States caused by persons acting under the color of state law.

## COUNT III – VIOLATON OF PLAINTIFF'S RIGHT TO DUE PROCESS

136.    All preceding paragraphs are incorporated herein as if repeated in their entirety.

137.    The Due Process Clause of the United States Constitution guarantees fundamental fairness to state university employees facing termination based on discipline. A person must be provided with notice and an opportunity to be heard. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-34 (6th Cir. 2017).

138.    The Sixth Circuit has clearly established that where, as here, credibility is at stake, in that one party maintains that the sexual encounter was consensual and the other says otherwise, a live hearing in front of the ultimate fact finder, with some form of cross-examination of the accusing party and corresponding witnesses is required. Complainant Jane was never cross examined by Masino or his counsel.  Defendant ETSU marshalled control over Jane as a witness and failed to produce Jane for cross examination by Masino or his representative.  Such was a clear violation of Masino's procedural and substantive due process rights. *Univ. of Cincinnati*; 872 F.3d at 396, 401-02; *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Smock v. Board of Regents Univ. Michigan*, United States District Court for the Eastern District of Michigan, Southern Division.

139.    Defendants intentionally and repeatedly refused to provide Plaintiff with the required due process protections.

140.    Masino alleges that on more than one occasion, state actors intentionally treated him differently than females similarly situated without any rational basis for the difference.

141.    Jane was given access to far more information and material than was Masino, who has a

Constitutional right to equal protection under the law when his fundamental rights were at stake.

142. Jane was permitted to view and respond to evidence while equal access and opportunity was not granted to Masino.

143. The law does not require that misconduct giving rise to a discriminatory outcome be of the same type and degree. *Heyne*, 655 F.3d at 571 Misconduct giving rise to termination need not be sexual misconduct. The degree of punishment for the seriousness of the offense can be compared.

144. Masino alleges that the different treatment he received was based on "purposeful or intentional" gender discrimination. *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004). Testimony in this case was a "he said, she said" and it is clear that no objective view of Jane's version of the events was more credible than Masino's.

145. Masino's Constitutional guarantee of substantive-due-process rights were violated because he was deprived of two constitutionally protected property interests: a property interest in tenure as an associate professor and a property interest in a record "unmarred" by the finding of responsibility for sexual misconduct.

146. Masino has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

147. Masino has a protected liberty interest in pursuing his employment and education at a public university, which the state cannot deprive him of absent due process.

148. Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

## COUNT IV – INVASION OF PRIVACY FALSE LIGHT

149. All preceding paragraphs are incorporated herein as if repeated in their entirety.

150.    ETSU's written statements about Masino given to the recipients as well as ETSU's other defamatory public statements placed Masino in a false light in the public eye.

151.    ETSU's statements attribute actions to the Masino that the Masino did not undertake and therefore present Masino in a false light.

152.    ETSU, through their malicious, intentional and/or reckless published statements has misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation, embarrassment, and emotional distress.

153.    ETSU released information directly to media sources, and Masino has proof of the publicity required by false light privacy claim.

154.    Upon information and belief, ETSU is well aware that the Masino is a licensed attorney and CPA. ETSU's actions were intended to prevent others from doing business with Masino and to portray the Masino as untrustworthy and unstable.

155.    Such conduct did in fact infringe upon Masino's ability to continue in his profession.

156.    ETSU's statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

157.    The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

158.    ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

159.    As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress in consequence of ETSU's statements.

160.    ETSU's statements have resulted in serious injury to the Masino's personal and professional character and reputation in the community, his employment and professional organizations. ETSU's false statements have caused tremendous personal humiliation and suffering to the Masino. As such the Masino has incurred financial losses and costs as a result of ETSU's false and defamatory statements.

161.    As a result of the false light painted by ETSU, the Masino has suffered damages including but not limited to harm to his interest in privacy and losses in business opportunities as well as the costs associated with addressing and resolving ETSU's false statements.

162.    The conduct of ETSU entitles Masino to the relief sought in this action.

## COUNT V – DEFAMATION OF CHARACTER

163.    All preceding paragraphs are incorporated herein as if repeated in their entirety.

164.    ETSU published false written statements against Masino.

165.    ETSU published these written statements with reckless disregard for the truth of the statements and with knowledge that these statements were of a defamatory nature.

166.    The false assertions published by ETSU injured Masino's character and diminished his reputation.

167.    Upon information and belief, the false assertions constitute Libel Per Se in that such remarks are libelous and damaging as stated without the need for contextual support.

168.    In addition to the above, the Masino has been defamed by ETSU.

169.    ETSU made a series of threatening communications to Masino while Masino was within the boundaries of Tennessee.

170.    ETSU began making a series of communications to Masino's coworkers while said recipient individuals were located within the boundaries of Tennessee.

171.   As previously alleged, ETSU published to others false and incorrect statements about Masino. ETSU's statements were and remain false. ETSU recklessly announced these statements to others knowing or should have known such said statements were false further damaging the professional and personal reputation of Masino.

172.   As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress.

173.   As a result of ETSU's statements, Masino has suffered serious injury to the Masino's personal and professional character and reputation in the community as well as personal humiliation and suffering. Moreover, Masino has incurred financial losses as a result of ETSU's false and defamatory statements.

174.   Masino further avers that the allegations against ETSU were made intentionally, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for their actions.

175.   The conduct of ETSU entitles Masino to the relief sought in this action.

176.   As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress.

177.   ETSU's statements have resulted in serious injury to the Masino's personal and professional character and reputation in the community, his employment and professional organizations. ETSU's false statements have caused tremendous personal humiliation and suffering to the Masino. As such the Masino has incurred financial losses and costs as a result of ETSU's false and defamatory statements.

178.   The conduct of ETSU entitles Masino to the relief sought in this action.

## COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

179.    All preceding paragraphs are incorporated herein as if repeated in their entirety.

180.    The State of Tennessee recognizes the common law tort of Intentional Infliction of Emotional Distress.

181.    ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

182.    ETSU's intentional conduct in ignoring witnesses and exculpatory evidence in their investigation of Masino as well as ETSU's refusal to initiate an investigation of Jane to this date constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

183.    ETSU's conduct of threatening constitutes extreme and outrageous conduct which exceeds all bounds of usually tolerated in a decent society.

184.    Upon information and belief, ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients was intended to cause severe emotional distress to the Masino or was done with such reckless disregard or indifference to the likelihood that Masino would suffer severe emotional distress.

185.    As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and severe emotional distress.

186.    ETSU through its malicious, intentional and/or reckless published statements has misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation, embarrassment, and emotional distress.

187. Such conduct did in fact infringe upon Masino's ability to continue in his profession.

188. ETSU's statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

189. The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

190. ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

191. The actions of ETSU were made intentionally, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for her actions.

### COUNT VII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

192. All preceding paragraphs are incorporated herein as if repeated in their entirety.

193. ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

194. Upon information and belief, ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients was intended to cause severe emotional distress to the Masino or was done with such reckless disregard or indifference to the likelihood that Masino would suffer severe emotional distress.

195. As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress.

196. ETSU's conduct in ignoring witnesses and exculpatory evidence in their investigation of Masino as well as ETSU's refusal to initiate an investigation of Jane to this date constitutes

extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

197.    ETSU through its malicious, intentional and/or reckless published statements has misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation, embarrassment, and emotional distress.

198.    Such conduct did in fact infringe upon Masino's ability to continue in his profession.

199.    ETSU's statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

200.    The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

201.    ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

202.    The actions of ETSU were made intentionally, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for her actions.

### COUNT VIII – CIVIL CONSPIRACY

203.    All preceding paragraphs are incorporated herein as if repeated in their entirety.

204.    ETSU should have known or knew the false and/or misleading statements and threats of false allegations against Masino were false.

205.    ETSU and others had the intent to accomplish this common purpose.

206.    Tennessee recognizes civil conspiracy tort as combination between two or more person to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.

207. Tennessee does not require formal intent for civil conspiracy, rather a tactic one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

208. ETSU's civil conspiracy is the proximate cause resulting in serious injury to the Masino personal and professional character and reputation in the community and her employment which has incurred financial losses and costs.

209. ETSU's civil conspiracy is the proximate cause resulting in serious injury to the Masino.

210. As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress.

211. The conduct of ETSU entitles Masino to the relief sought in this action.

212. The Masino further avers that the allegations against ETSU were made intentionally, willfully, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for ETSU's actions.

## COUNT IX – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

213. All preceding paragraphs are incorporated herein as if repeated in their entirety.

214. The State of Tennessee recognizes the common law tort of Intentional Interference with Business Relationships.

215. ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

216. Upon information and belief, ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients was intended to cause severe emotional distress to the Masino or was done with such reckless disregard or indifference to the likelihood that Masino would suffer severe emotional distress.

217. As a result of ETSU's conduct, Masino suffered severe emotional distress.

218. The Masino had a positive business relationship with clients and the community.

219. ETSU knew of the business relationship with ETSU as well as local businesses.

220. ETSU's false statements were malicious and/or reckless with the intent to cause harm to the Masino's existing business relationships.

221. ETSU had improper motive.

222. ETSU's malicious, intentional and/or reckless published statements misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation, embarrassment, and emotional distress.

223. ETSU's conduct did in fact infringe upon Masino's ability to continue in his profession.

224. ETSU's statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

225. The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

226. ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

227. As a result of ETSU's actions, Masino has suffered a loss of his primary job, mental anguish, humiliation, and emotional distress.

228. ETSU's actions have resulted in the Masino losing business opportunities, business relationships and/or status at his employer.

229. The actions of ETSU were made intentionally, recklessly, and maliciously therefore

entitling Masino to punitive damages to punish ETSU for her actions.

## COUNT X – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

230.    All preceding paragraphs are incorporated herein as if repeated in their entirety.

231.    The State of Tennessee recognizes the common law tort of Intentional Interference with Contractual Relationships.

232.    ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

233.    Upon information and belief, ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients was intended to cause severe emotional distress to the Masino or was done with such reckless disregard or indifference to the likelihood that Masino would suffer severe emotional distress.

234.    As a result of ETSU's conduct, Masino suffered severe emotional distress.

235.    The Masino had an existing contractual relationship with ETSU as well as local businesses.

236.    ETSU knew or should have known of the contractual relationship with ETSU as well as local businesses.

237.    ETSU's false statements were malicious and/or reckless with the intent to cause harm to the Masino's existing contractual relationships.

238.    ETSU had improper motive.

239.    ETSU through her malicious, intentional and/or reckless published statements has misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation,

embarrassment, and emotional distress.

240.   Such conduct did in fact infringe upon Masino's ability to continue in his profession.

241.   ETSU's statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

242.   The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

243.   ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

244.   ETSU's actions have resulted in the Masino losing business opportunities, business relationships and/or statute at her employer.

245.   The actions of ETSU were made intentionally, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for her actions.

### COUNT XI – MALICIOUS HARASMENT

246.   All preceding paragraphs are incorporated herein as if repeated in their entirety.

247.   The State of Tennessee recognizes the common law tort of Malicious Harassment.

248.   The Masino has a property right to his CPA license.

249.   The Masino has a property right as a tenured faculty member.

250.   ETSU's behavior constitutes extreme and outrageous conduct which exceeds all bounds usually tolerated in a decent society.

251.   Upon information and belief, ETSU's conduct in publishing the above oral and written false and defamatory statements to the recipients was intended to cause severe emotional distress to the Masino or was done with such reckless disregard or indifference to the likelihood that

Masino would suffer severe emotional distress.

252.    As a result of ETSU's conduct, Masino suffered severe emotional distress.

253.    The Masino has an existing contractual relationship with ETSU as well as local businesses.

254.    ETSU knew or should have known of the contractual relationship with ETSU as well as local businesses.

255.    ETSU's false statements were malicious and/or reckless with the intent to cause harm to the Masino's existing contractual relationships.

256.    ETSU had improper motive.

257.    ETSU through her malicious, intentional and/or reckless behavior and false statements has misled others as to the character and nature of the Masino and cast Masino's reputation in a false light before the public causing Masino a loss of his primary job, mental anguish, humiliation, embarrassment, and emotional distress.

258.    Such conduct did in fact infringe upon Masino's ability to continue in his profession.

259.    ETSU's behavior and false statements are objectionable to the Masino under the circumstances and are objectionable to a reasonable person.

260.    The statements made by ETSU were reckless and in disregard to factual information known to ETSU at the time of the statements.

261.    ETSU acted with reckless disregard as to the false statements about the Masino and ETSU knew of or should have known that said statements were false and painted the Masino in a false light.

262.    ETSU's actions have resulted in the Masino losing business opportunities, business relationships and/or statute at her employer.

263.   ETSU's actions precluded Masino from Masino free exercise or enjoyment of Masino's constitutional rights.

264.   The actions of ETSU were made intentionally, recklessly, and maliciously therefore entitling Masino to punitive damages to punish ETSU for their actions.

## CONCLUSION

265.   In Title IX investigations, Universities are to serve as an arbiter of truth, not a prosecutor. ETSU, in conducting the Title IX investigation and its related administrative processes, disregarded its legal and ethical obligations to first seek the truth and instead played the role of prosecutor in behalf of the complaining party, Jane, against Masino.

266.   Analysis of the behavior and collective efforts of ETSU, its agents and employees, confirms the instant Title IX investigation produced a bludgeoning tool designed to beat Masino into submission and to convict him of each and every allegation against him.

267.   ETSU, in production of the Title IX investigation and its administrative aftermath, from the onset (including statements made by ETSU legal counsel office as well as Noland) sought a singular result: the termination of Masino and the ruination of his reputation such that he will be permanently tainted as a college professor.

268.   The foregoing objective was stated clearly to Masino and others by the Legal Department before the investigation was undertaken in an attempt to dissuade Masino from for opposing the unlawful process and fighting the untrue allegations against him.  ETSU legal told Masino he would be better off resigning instead of facing ruination.

269.   Those involved in the conspiracy to terminate and destroy Masino via the Title IX process included the University President, certain members of its Board of Trustees, its Legal Department and its Title IX Department.  ETSU knowingly allowed parties that Masino had

34

previously reported (Ed Kelly, Troy Perdue, Courtney Kelly, Burkette, Michelle Byrd) for unethical and / or illegal behavior participate in the investigation against Masino.

270.    The only remedy for the havoc reeked upon Masino by ETSU is a determination the resulting "findings" of the Title IX investigation, procured unlawfully and unethically, be set aside and excluded from evidence with all claims against Masino dismissed. Masino should be reinstated with back pay and made whole.

271.    The interest of justice, fairness and equity auger in favor of the foregoing, and the law requires such. All actions taken by ETSU flowing from the unlawful Title IX investigation which ultimately led to termination of Masino should be treated as civil "fruit of the poisonous tree" with the entire tainted investigation and its sequala set aside.

272.    ETSU engaged in coaching and assisting Jane against Masino despite its knowledge of the truth. ETSU ignored exculpatory evidence and enlisted deceit and intimidation as tools to fashion the investigation's outcome against Masino and to color material witnesses against him.

273.    When taken in context of Title IX investigation, Universities have a duty as a seeker of the truth, not the role of a prosecutor. Any combination of the behavior shown by ETSU personnel and legal counsel office would dictate in the interest of justice, fairness and equity that the resulting investigation be dismissed and all aspects arising from it treated as fruit of the poisonous tree. Yet in the case of ETSU, facts known have shown ETSU committed each gross misconduct action before, during and after ETSU investigation of Masino. ETSU ignored federal, state and University policies regarding fair and equitable treatment; engaged in coaching and assisting one party versus another; ignored exculpatory evidence and repeated proper complaint notices by multiple parties against a questionable accuser; combined ancillary investigations outside the scope of the University and/or Title IX against Masino; and utilized

deceit and / or intimidation to parties and potential witnesses.

**DEMANDS AND REQUESTS FOR RELIEF**

**Wherefore** Plaintiff Masino, individually and in behalf of his minor children, the Minor Plaintiffs C.M. 1, C.M. 2, and L.M. 3, request the following Relief and Demand Judgment against Defendants, individually, jointly and severally, as follows:

**A.    Equitable Relief:**

1.    An injunction from this Court prohibiting Defendant from further use of the Policy PPP-80 as to any student or employee because it is unconstitutional and is a deprivation of due process rights;

2.    A ruling that, as a matter of law, Plaintiff's due process rights were violated.

3.    Require ETSU to expunge the entire incident at issue from its records;

4.    An award of interest, costs and reasonable attorney fees; and,

5.    Whatever other equitable relief appears appropriate at the time of final judgment. of final judgment.

**B.    Legal Relief:**

1.    The facts known so far justify prejudicial dismissal of all aspects of the investigation as ETSU has unreasonably tainted Masino's ability to receive a fair and unbiased investigation.  The plaintiff(s) through counsel, at a minimum respectfully request the Court should order suppression of the tainted investigation, notify Tennessee Board of Professional Responsibility to the behavior and misconduct of ETSU legal counsel office personnel and assess maximum punitive damages against ETSU to punish the defendant for their outrageous conduct, as well as reform and deter similar type behavior by the

defendant or others.

2.      Compensatory damages in whatever amount Plaintiff is found to be entitled;

3.      Exemplary damages in whatever amount he is found to be entitled;

4.      Punitive damages for all counts in whatever amount he is found to be entitled; and,

5.      Reinstatement with back pay, that Masino be made whole and that he be awarded interest, costs, reasonable attorney fees, and expert witness fees.

## JURY DEMAND

Plaintiff Anthony Masino, individually and behalf of his minor children, demands a trial by jury of all the issues in this cause that are so triable.

Respectfully submitted,

Dated this 31 day of July, 2020

Anthony G. Masino
Plaintiff – Pro Se
PO Box 4433
Johnson City, TN 37602
727-510-8389

37