# EXHIBIT A

# AFFIDAVIT OF FREDERICK J. ALSOP III

I, Frederick J. Alsop, III of sound mind, give this affidavit by my own free will.

I am a resident of Carter County, Tennessee. I have been employed at East Tennessee State University since 1972. I hold the rank of Professor. I am a member of the ETSU Faculty Senate Executive Committee. I am a member of the Board of Trustees for East Tennessee State University. As a member of Faculty Senate Executive Committee and Board of Trustees, I have interacted with Anthony Masino many times over the years. Several of those interactions have created animosity by ETSU legal counsel office towards Anthony.

I met Anthony upon his election to the Faculty Senate in 2013. Shortly after his election, we worked on a Committee to review ETSU's tenure termination policies and procedures. This Committee was created due to feedback on the alleged historical misconduct of ETSU legal counsel office. Anthony very quickly undertook the bulk of research and provided feedback to the rest of the Committee. Anthony's research compared ETSU's tenure termination procedures to procedures and policies of TBR as well as other universities. The comparison found more than a dozen items where ETSU's tenure termination procedures infringed on basic constitutional rights; conflicts of interest within the ETSU legal counsel office; the potential to create hostile environments for faculty endangering fair and impartial investigations of faculty; and restrictions on due process rights. His research outlined suggestions and edits to the policy to comply with existing TBR policy as well as suggestions to insure alleged heavy-handed tactics by ETSU legal were kept in check. The Committee's suggestions were overwhelming approved by the faculty senate which forced ETSU to address the issue. Most of the Committee's recommendations were adopted by ETSU. ETSU chose not to adopt Anthony's recommendations to insure checks and balances against ETSU legal. Those recommendations were:

1. At least one seat on every tenure termination committee be held by a tenured faculty member with a law degree;
2. ETSU legal personnel could only act as prosecutor, refrain from acting as a hearing officer or advise the tenure termination committee;
3. ETSU hire outside arbitrator / mediator to act as hearing officer to advise tenure termination committee;
4. ETSU create an office of Ombudsman to participate in all investigations as a neutral party;
5. ETSU hire outside investigators or hire experienced investigators with a law enforcement background; and
6. Investigators have no contact with members of ETSU legal during the investigation and separate reporting contact.

Anthony championed these recommendations as a form of protection for all parties involved, the faculty member as well as ETSU, to avoid unnecessary litigation.

Over the years, Anthony has actively participated in faculty senate and the executive committee. Anthony's knowledge and service are well respected by most fellow faculty senators. When ETSU legal requested faculty senate vote on changing the consensual relationship policy, Anthony with other faculty members, pointed out potential constitutional issues including right to privacy (ETSU legal wanted a requirement to report private consensual relationships). ETSU legal kept referencing sexual misconduct and harassment policies versus consensual relationship policies. Again, Anthony provided consensual relationship policy comparisons to other Universities to faculty senate. Anthony outlined his belief ETSU legal was trying to have faculty senate approve changes that were likely unconstitutional in an attempt to avoid potential sovereign immunity issues. Faculty senate overwhelming voted against adopting the changes. When ETSU faculty senate reconvened the next academic year (with turnover over of a significant number of senators), ETSU legal asked faculty senate to vote again. Again, faculty senate voted against the policy changes. Shortly thereafter ETSU legal formed a committee to review the proposed policy. Faculty senate voted to place Anthony on the Committee as their representative.

When a faculty member was facing tenure termination, Troy Perdue with University Relations Office, spoke before faculty senate. Pursuant to a subpoena, Troy asked faculty to search their email for words with "erect". Troy mentioned ETSU could do it themselves but didn't want to make it easy for opposing counsel. Anthony objected to Troy's comments warning Troy ETSU could be jeopardizing itself to court sanctions for not complying with a subpoena. This indifferent type of comment by Troy is not unheard of. At ETSU's Marketplace cafeteria in the presence of faculty colleagues Troy once made inappropriate sexual comments regarding the guest who attended an earlier event with me at Shellbridge.

Anthony on more than one occasion informed President Noland to concerns with ETSU legal office. Anthony and other faculty members have repeatedly requested ETSU create an office of an ombudsman to insure checks and balances against ETSU legal counsel office. Faculty Senate Executive Committee requests to President Noland to implement an ombudsman position have been repeatedly deferred.

The feedback from various sources on Anthony's matter seems to fit an alleged behavior pattern of the ETSU legal department which has triggered previous requests for an ombudsman system. I have heard other faculty members tell me their interaction with Ed Kelly in which Ed has reportedly stated one of his favorite parts of the job is removing tenured faculty members.

Recently members of faculty senate executive committee have been asked to refrain from recording meetings without permission. Anthony raised concerns with this possibly violating state open records laws.

# AFFIDAVIT OF FREDERICK J. ALSOP III

During a faculty senate executive meeting with President Noland, Anthony informed President Noland ETSU General Counsel Ed Kelly was breaking state nepotism laws by employing his daughter and utilizing ETSU legal counsel office personnel as a buffer.

In 2017 during a faculty senate executive committee meeting with President Noland, Anthony shared Ed Kelly's feedback to Anthony's request an upcoming tenure termination committee seat be filled by a tenured faculty member with a law degree. Anthony outlined his concerns that Ed was exposing ETSU to unnecessary litigation. I am unaware of any follow-up or implementation of Anthony's recommendation by ETSU.

In a different faculty senate executive committee meeting with President Noland, Anthony discussed his research of comparing legal counsel offices and investigatory techniques of other universities to ETSU legal counsel office. Anthony requested President Noland hire an outside law firm to do a peer review of the ETSU legal office. Anthony openly stated his belief ETSU legal counsel office was below average in size for a university the size of ETSU and his belief this was purposefully done. Anthony stated his belief that if the office had additional attorneys, professional legal ethics would cut down on the number of alleged unconstitutional and potential illegal misconduct complaints.

It is well known within faculty senate and campus, Anthony has objected to the behavior and conduct of ETSU legal counsel office. This has earned the respect of other faculty senators who believe Anthony has the courage to stand up against misconduct. It is very apparent animosity exists between the ETSU legal counsel office and Anthony.

During the first days of February 2018 Anthony and I had lunch. I had not seen Anthony since the Fall 2017 term, Anthony had lost a significant amount of weight. Anthony disclosed his accounts had been hacked, that he was being stalked and threatened by a former student he had a relationship with and had gone to ETSU legal about it. Anthony disclosed his concerns with having to deal with ETSU legal counsel office. Less than two weeks later Anthony came to me exposing the behavior of ETSU legal counsel office. Anthony told me the female filed a complaint against him after breaking into his house. When Anthony went to ETSU legal them of the recent break-in, Anthony said Ed Kelly and Troy Perdue reminded him of his past notices against their office and threatened to terminate him if he pursued charges against the female. Anthony said he planned to speak with President Noland and hire an outside counsel because of the comments by ETSU legal counsel. He later shared when he went to speak with President Noland, Ed Kelly sent him an email forbidding him from speaking with President Noland. Anthony was flabbergasted no mechanism existed to report the behavior of ETSU legal counsel office.

During Spring 2018, President Noland commented on the investigation more than once. President Noland's comments indicated he was being provided information from ETSU legal

counsel office that could impact his decision-making process. President Noland made comments about Anthony having relationships with multiple former students. President Noland commented Anthony should stop complaining about the ETSU legal counsel office. I believe ETSU legal counsel office was proactively creating bias against Anthony to President Noland.

I am aware ETSU legal counsel or administrators were talking to other faculty senate members regarding the investigation who in turn were sharing details with others. I believe ETSU legal counsel was purposefully discrediting Anthony to others and impacting his ability to receive a fair investigation.

I believe ETSU needs an office of an ombudsman and a true independent open transparent review of the ETSU legal counsel office by an outside law firm.

Sincerely,

*Frederick J. Alsop III*

Frederick J. Alsop, III

Commission expires
7/27/22

STATE
OF
TENNESSEE
NOTARY
PUBLIC
MAICEY GRINDSTAFF
WASHINGTON COUNTY
My Commission Expires JULY 27, 2022

# EXHIBIT B

# Affidavit of Crystal Salyer

To Whom It May Concern:

In February of 2018, Dr. Barry contacted me more than once regarding Anthony Masino. Dr. Barry contacted me on my cell and at work to talk about my former relationship with Anthony. Dr. Barry asked me if it was better to speak after work to avoid trouble with my job as the company was a good friend of ETSU. I informed Dr. Barry I was not interested in rehashing the past, I had already spoken with ETSU and previously provided an affidavit. Dr. Barry wanted to know if my interactions with Anthony were what was being experienced by a student who filed a complaint against him. I asked what the female went through. Dr. Barry made disturbing statements regarding Anthony that were contradictory to my history with him. Based on my past interaction with ETSU, I took notes:

- Anthony had forced the female into a relationship while she was in his class and threatened her to stay in the relationship.
- Anthony had been madly in love and possessive and became upset that the female broke free of him.
- She was being stalked and threatened by him.
- Anthony had accused the female of cheating on him.
- Anthony had been making up stories to members of ETSU legal to discredit the student in anticipation the student would file a complaint against him.
- Anthony had lied about the student cheating on him and harassing him.
- It was apparent Anthony was lying about the female entering his work computer, phone, and copying his files.
- The student discovered Anthony had cheated on her with multiple females, one of her close friends who had taken Anthony's class with her and one from his recent tax class.
- Anthony had several relationships with students including some while they were in his classes.
- Anthony was caught with a former student at his house.
- The student advised ETSU that Anthony was running a business out of his office.
- The student advised ETSU Anthony was acting as a lawyer in Tennessee.
- Anthony was falsely claiming he was afraid of the student to block the student from ETSU functions.

Dr. Barry went on to assure me the female was innocent, rather Anthony was the harasser and the female was in danger. Dr. Barry said Anthony's coercion of the female into the relationship was akin to rape. She asked if I thought Anthony groomed me. If I thought he was a predator capable of violence. She asked if Anthony had done legal work for me. I asked if I was allowed to answer that and she responded by asking the question slightly differently by asking if he had ever done legal work for me in Tennessee (he never has).

I responded I couldn't believe Anthony could do the things he was accused of as he had never shown any behavior like that. I shared with Dr. Barry how I still considered Anthony a reliable and trustworthy friend. I shared with her some of my experiences with Anthony including my belief Anthony doesn't show emotion (one way or the other except for his kids). I told her about Anthony going out of his way to help people without recognition and shared as an example of his kindness to me when I had no one else and Anthony had no obligation to

# Affidavit of Crystal Salyer

help me. How Anthony helped with landscaping when I was pregnant, how he provided financial assistance when I lost my job, how he never judged me and always offered advice when I asked. Dr. Barry assured me the accusations were verified and investigations by ETSU police had already confirmed several aspects.

Later I told Anthony about Dr. Barry and learned the complaint had been filed in February days after the female had broken into his house. If the complaint was filed in February, how could how Dr. Barry confirm the accusations so quickly. Based on my history with him and my previous treatment by ETSU, I believe Anthony.

Beginning in March I received chat requests to talk about Anthony and our former relationship. Search of the source handle looked like it was a recently created fictitious account. My cell phone started receiving calls from blocked numbers. I received messages from unknown accounts asking about Anthony. The messages started with asking to speak with me about Anthony. Later messages asked questions if Anthony told me he loved me, if Anthony held me at night, had Anthony taken me dancing or on trips, had I met his friends. I never responded to the texts or messages.

Dr. Barry asked leading questions regarding my previous relationship with Anthony, as if she was trying to get a confirmation. Her statements while questioning me were the opposite of my history with Anthony. I told her my previous interaction with ETSU about the matter all arose because my soon to be ex-husband reacted to my refusal to stop our divorce and reconcile. As a former Marine who had served multiple tours in Iraq, Trevor could become hostile at times. Right before Christmas in 2013 he reacted to my rejection by creating a scene with Dr. Burkett. While our marriage had been volatile at times with mutual mistakes, the end of our marriage was due to Trevor's behavior. When Trevor realized his mistakes and tried to stop the divorce and reconcile, it was too late for me. Anthony was not the reason but was an easy person for Trevor to place the blame versus addressing his own mistakes. Today Trevor is a better father and person for taking responsibility and changing his behavior patterns.

In January 2014, Troy Perdue, an ETSU attorney, contacted me. He asked if I was afraid of Anthony, if I felt Anthony as a faculty member was impacting my education and job opportunities. Mr. Perdue wanted to know if Anthony broke up my marriage by coaxing me into an affair. Mr. Perdue kept referring to it as an affair. I repeatedly corrected him explaining it was not an affair and the issues within my marriage were none of ETSU's business. Mr. Perdue stated ETSU had pulled the divorce paperwork and could force me to cooperate as a student. I objected to the intrusive nature of the questions and informed Mr. Perdue I was not filing a complaint against Anthony and apologized for the scene Trevor created after I wouldn't cease divorce proceedings and reconcile. Mr. Perdue threatened my refusal to answer could jeopardize my financial aid and I could be suspended from classes. I answered his inquiries out of fear. I stated Anthony did not coax me into the relationship, I pursued Anthony. I had been around Anthony on campus, at church, and social events. How Anthony allowed me to babysit his kids to earn extra money. Anthony listened to me, never judged me. He gave me advice and guidance, and never asked for anything in return. How months earlier Trevor sent Anthony a voicemail stating the two of us having a relationship was not an issue for Trevor. He asked if Anthony still had the voicemail – I told him to ask Anthony. I explained Anthony was supportive of me before and after our relationship (and still is) and had never threatened me. I

# Affidavit of Crystal Salyer

told him Anthony never spoke badly about Trevor and at the time Trevor and I still allowed our daughter to play with Anthony's kids and we still used Anthony as a babysitter for our daughter. Anthony had our trust with our child. I revealed Anthony would talk up Trevor to our daughter to repair the relationship between them, telling her how brave her daddy was for being a police officer, how much she looked like her daddy and how her daddy would always be there for her. I shared how Anthony even tried to help me with my anger at Trevor, asking me to understand everyone makes mistakes and if Trevor had realized his, maybe reconciliation was possible. Anthony asked me to understand Trevor's emotions, to not hold Trevor's reaction against him for rejecting his reconciliation attempt. Anthony kept saying Trevor is the father of your child, think long-term. Mr. Perdue sounded irritated and ended the call.

I told Anthony about my call with Mr. Perdue and the anxiety attacks it triggered for me (I broke out in hives). Anthony was apologetic for the actions of Mr. Perdue. Anthony advised me to focus on finishing my degree and move on. I provided an affidavit at the time and never thought the issue would ever come up again.

I am aware of the recent press coverage regarding the matter and in no way believe Anthony is capable of the things being stated about him. Anthony is a good father, was a great professor and always acted properly. When I was a student at ETSU, several of my female classmates discussed their desire for him and attempts to flirt with him. Everyone of them stated he ignored their overtures. When our relationship started, I was no longer his student, had no intention of taking a class from him again. I confirmed our relationship did not violate ETSU policy prior to pursuing Anthony.

As a result of being questioned by ETSU, I, Crystal Salyer, a resident of Unicoi County, give this statement free of threat, duress, and harm.

Crystal Salyer

### ACKNOWLEDGMENT

State of Tennessee,
County of Washington
On this 5th day of April, 2019, Crystal Salyer personally appeared before me,
☐ who is personally known to me,
✓ whose identity I verified on the basis of TNDL.
☐ whose identity I verified on the oath/affirmation of
a credible witness,
to be the signer of the foregoing document, and he/she acknowledged that he/she signed it. *Julie E Gray*
Notary Signature
My Commission Expires: 02-04-2023

JULIE E. GRAY
STATE OF TENNESSEE
NOTARY PUBLIC
WASHINGTON COUNTY

# EXHIBIT C

I, Valerie Gail Swartz, resident of Washington County, Tennessee at 1803 Sundale Road, Johnson City, am of sound mind and give this sworn statement of my own free will. I am providing this sworn statement to clarify information I believe is incorrectly attributed to me in the May 2018 ETSU Title IX Investigation Report of Professor Anthony Masino and summarize my knowledge of investigation matters and parties.

I have been the Executive Aide for the Department of Accountancy for over 35 years. I am aware of the historical workings of the department and my job duties and location give me access to knowledge, conversations, etc. of the Department.

I have known Anthony Masino since his arrival to ETSU in 2012. Anthony has been instrumental member of the Department from his work ethic to volunteering for assignments and projects which have been difficult and/or too time consuming for other Department faculty to undertake.

Anthony has been a faculty senate representative for the College of Business & Technology since 2013. Anthony has openly discussed some of his undertakings with faculty senate which brought him in contact with ETSU legal counsel office and the behavior of ETSU legal counsel office and staff. It is well known within the college that Anthony has taken stances against ETSU legal counsel office. My personal interactions with ETSU's legal counsel office and staff have been extremely limited, but according to local feedback, I do not feel their overall attitude and procedures, with regard to many of the faculty and staff in the College of Business, is overly favorable.

I believe the some statements attributed to me in the May 2018 Title Report may have been taken out of context and relevant information I provided was ignored. To assist the reader, I have summarized below information on a timeline format which I believe is relevant to the matter.

During the Summer of 2017, Dr. Gary Burkette, Department chair went out on medical leave for a short period. Unfortunately, but understandably, since Gary's operation and the procedures he went through, his memory has been spotty. Occasionally, I have to remind him of things discussed by sending him written confirmations or reminding him of general conversations (I disclosed this to ETSU legal when I met with them). Due to Gary's medical leave and the fact that the office needed someone in authority to sign paperwork and make necessary decisions that concerned the department, Gary informed me that Anthony Masino had been asked to be the temporary Assistant Chair. To my knowledge, no other responsibilities outside the scope of "general" office work or decisions were assigned or implied to this position.

This conversation took place in our departmental office, which I heard. Anthony came in and informed Gary he was dating a student. Gary asked Anthony if the student was enrolled in any of his classes. When Anthony stated she was not, Gary stated he did not want to know any additional details and they both walked out of the office. In the

Spring of 2018 I was called to speak with ETSU legal counsel office regarding the investigation of Anthony, where the details of the Summer 2017 conversation between Gary and Anthony would have been disclosed.

In January 2018, Anthony came back from the Christmas holiday a different person, emotionally speaking. He was not the happy, smiling professor that I had become accustomed to seeing all the time. During the following weeks, it was apparent that Anthony was dropping dramatic amount of weight, he looked stressed all the time and acted as if he was not sleeping well. I asked him if he was alright. Anthony disclosed he had been in what he thought had been a serious relationship. Sadly, the female had lied to him regarding several items and he discovered she had cheated on him with a former boyfriend. He disclosed that her roommate had told him her behavior had been going on for months. Anthony expressed serious concerns with her behavior but never disclosed her name.

By the middle of January, Anthony indicated his attempts to distance himself from the female was not working. He said that when he told her that the relationship was over, he indicated her behavior became extremely erratic and harassing. She would not leave him alone. Anthony told me he regretted catching her cheating, as she was threatening him of the consequences if her family found out about her behavior. He also disclosed she had sent him photos of files that she could have only obtained from illegally hacking his accounts and devices. She was also was threatening to file false allegations against him, would try to disrupt his custody agreement, and impact his mother's estate. Anthony stated she was stalking/harassing him at home and work daily.

Anthony continued to lose weight and looked under extreme stress. He disclosed he was trying to help the roommate of the former girlfriend as the roommate was afraid the former girlfriend was his only friend, he would be left alone. Anthony disclosed he had started talking to a therapist and had offered to help find a therapist for the roommate as well. Other staff and faculty in the building were starting to talk about Anthony's weight loss and his frayed look. Many shared their worries that he looked frazzled, nervous or scared.

At the beginning of the Spring 2018 term, a student, ████████, came to my office and requested a permit for enrollment into a closed section of an accounting class. I had previously spoken to ████ prior to the start of the Fall of 2017 classes, regarding the class and other course requirements for graduation. I advised her to take the class in question during the fall term, but for some reason, she disregarded my advice. As expected, in the spring term, the class filled to capacity no students were being granted a permit for enrollment and I told ████ that. After speaking with Gary, I told her to check with a few universities that offered online classes to see if she could find the class take it online, and then transfer the credit back to ETSU. She left the office after that conversation. In the meantime, Gary called Anthony Pittarese (Chair of

Affidavit of: _Valerie Savage_     Signature: _Valerie Savage_     Date: _____

Computer Science) and asked him if there was a class we could get ▮▮▮ into...in the event she was unable to find a class on her own. Shortly thereafter, Gary was called to the Dean's office to talk about ▮▮▮ need for a computer class. We learned ▮▮▮ had lied to the Undergraduate Dean's office regarding our previous instructions regarding her coursework and had apparently told them we would not help her. Ultimately, Gary was told ▮▮▮ was given a permit into a computer class by the Undergraduate Dean, Suzanne Smith. When Gary returned from the her office, Gary disclosed that the student Anthony had been dating was ▮▮▮. Gary, nor I, knew that prior to that time and we did not tell Anthony we had found out who she was.

By the end of January, Anthony was coming to campus less frequently on the days he did not teach, which was out of the ordinary as he normally would be in the office almost daily since his children went to University School. He shared his ex-girlfriend was coming to campus to stalk him on days she did not have class. Finally, Anthony disclosed ▮▮▮ was the ex-girlfriend, that her behavior was becoming more erratic and concerning, and that he was in fear for himself and his family. He indicated he had spoken with Troy Perdue who referred him to report any incident to the ETSU police. Anthony stated ETSU police were already pulling information to confirm her illegal entry into his accounts and he had been instructed to wait until the data was available before pressing charges.

At the same time in Spring 2018, ▮▮▮ was enrolled in Advanced Accounting with Dr. Michelle Freeman. Anthony said that ▮▮▮ was threatening to say that he and Michelle were conspiring to fail her. Both Michelle and Anthony clearly stated they had no such conversation and neither party would do such a thing.

I disclosed my initial dealings with ▮▮▮ and a particular situation with Joel Faidley to ETSU legal when I was interviewed. Joel came to my office and asked me if I could proctor some exams for a repeat student in his class who had indicated that she was she was a disability student and needed extra time. Even though she had never given any of the required paperwork to him or had mentioned that she was a special-need student before, he said he would let her take the exams with extended time. He did indicate he did not believe she was handicapped in any way, but did not want to cause any problems. I agreed to proctor the exam(s) and a minute or so later, ▮▮▮ walked in. I later learned that ▮▮▮ had previously threatened to file some type of allegation against Joel, after she did not pass his course for the second time. I also found out that Gary talked with Joel who agreed to change ▮▮▮ grade to avoid allegations of any kind.

Near the end of January, Anthony, who was the coordinator over the VITA (Volunteer Income Tax Assistance) program, disclosed ▮▮▮ had previously expressed interest in participating in VITA, but had decided not to volunteer. However, after Anthony tried to cease contact with ▮▮▮, he indicated ▮▮▮ decided to do VITA so she could to be closer to him. He asked to be released from VITA because he expressed

Affidavit of: _Valerie Sowers_   Signature: _Valerie Sowers_   Date:

fear of being around ▮▮▮▮. Anthony repeatedly stated if she wanted to participate in VITA, he would remove himself. To understand the importance of Anthony to VITA, the entire program was started and coordinated under Anthony's credentials, so no one else could take over on short notice...the IRS would not allow it to run without him. Without Anthony, VITA was in danger of not taking place. There was a discussion of placing Anthony in a separate room from ▮▮▮▮ and have ▮▮▮▮ report to another faculty member.

Anthony came to the office and Gary telephoned Troy Perdue to request a meeting to discuss Anthony's fear of ▮▮▮▮ and Anthony's participation in VITA. The left to go see Troy. After Anthony and Gary returned, the feedback was "legal said hope she doesn't pass the VITA entrance exams". There was also a discussion after they returned about an ETSU security officer being present during the VITA program if necessary for safety precautions.

Prior to the second VITA session, Gary and another faculty member contacted the IRS about assuming VITA from Anthony. When it was learned VITA was linked to his professional licenses, the plan changed to keeping Anthony in VITA but offering security on site. I later learned security was not present at the second VITA site and Anthony was sent home. Ultimately, the program was offered on schedule, but a different software had to be used, as Anthony was not at the site during the preparation of the tax returns and we could not operate the same without him present.

The following Monday, I was informed that ▮▮▮▮ had broken into Anthony's home Friday night, caused a disturbance, police had to escort her from the residence. Late that afternoon, Anthony came to the office after meeting with ETSU legal counsel personnel. He shared they threatened to fire him for retaliation if he filed a restraining order against ▮▮▮▮, pursued criminal charges or sued her. It was apparent Anthony was scared before her break-in, but after the break-in, Anthony was petrified of her. Anthony and Gary spoke openly about the behavior of ETSU legal counsel, to which Gary advised him to speak to President Noland and hire an attorney.

Shortly thereafter, we were notified ETSU legal counsel personnel wanted to speak with us. Gary went to speak with them first. When Gary returned from his meeting, he was visibly shaken. He told me ETSU legal had indicated he could lose his job if they felt he was assisting or lying for Anthony. Gary shared his belief ETSU legal was out to get Anthony. Shortly thereafter, Gary's behavior towards the situation changed dramatically. Gary went from concerned for Anthony and his children to fearful of upsetting ETSU legal.

Eventually, I was asked to go to speak with ETSU legal. My meeting included Michelle Byrd, Tracy Barry and Lisa Williams. Among other things, I was asked things like: if Anthony had practiced law for me (he would refer me to local attorneys), what my relationship with Anthony was like, if I had any historical dealings with ▮▮▮▮ did I

Affidavit of: _Valerie Sweat_   Signature: _Valerie Sweat_   Date: _____

think Anthony was a rational person, did I have any knowledge of him harassing ███████ did I know of any incidents that happened down in the faculty offices, etc. I was also asked about a previous incident in which a former student came to our office with her soon to be ex-husband, complaining the former student and Anthony were having a consensual relationship while the parties were divorcing. Gary and I never really understood the purpose of that meeting, as neither the student nor the husband wanted any kind of reprimand against Anthony or information disclosed to anyone about the affair. Gary told her it was his responsibility to inform ETSU legal, and I believe he call Troy shortly thereafter. Nothing came of the incident.

I informed ETSU legal that Anthony was heartbroken over the break-up because he thought they (he and ██████ were in love. They asked me if I thought he was being irrational and I said no...not at all. Anthony never acted like he wanted revenge or showed any anger toward ██████ at that time or any time. He just wanted her to leave him alone. However, Anthony indicated her behavior continued to change and said that ██████ was stalking, harassing him and threatening him and other people in the building were beginning to see episodes of her conduct. He was fearful of her. The heartbroken comment is taken out of context. I informed ETSU of ██████ previous behavior including lying to parties for her advantage, her threats of allegations against another faculty member, etc., those statements were ignored. I shared other faculty had said they had seen her stalking before and after her filing a complaint against Anthony, but this fact was ignored. I reminded them Gary and Anthony went to legal to report her behavior and seek protections prior to her complaint. ETSU acted as if Anthony's concern for his children was not relevant when I explained how Anthony was about to break down in tears when his children's school notified him that someone was trying to pick up his kids from school without authorization. I felt then and continue to feel to this day, that ETSU disregarded any of my statements that appeared to show Anthony in a positive light. Further, any negative information which was offered about my initial dealings or knowledge about ██████ during my interview with ETSU legal, was not indicated in the final report.

Around this same time, a former student, ████████████ started to harass Gary, me, Anthony, Richard Manahan and other department members. Anthony and others alerted Gary (Gary had previously made statements Gary thought the female was ██████ before discovering it was ██████) to ██████ behavior. ETSU legal and police informed Gary and other faculty members to contact security if ██████ showed up in on campus. As far as I'm aware, those same instructions were not given to Anthony. Rather, ██████ continued to harass Anthony, Anthony continued to report her behavior. When I asked why Anthony was not being instructed same thing, the feedback was that Anthony was on his own.

Affidavit of: _Valerie Stuart_   Signature: _Valerie Stuart_   Date:

To this day, I have not heard Anthony speak disparagingly of ████ His comments to Gary were always to his fear and safety concerns for his children.

After reading the May 2018 report, I am concerned information I provided was ignored, statements I made were taken out of context and information regarding the veracity of ████ was ignored and very real fear expressed by Anthony to ETSU was ignored. I have heard other faculty members make similar reference to their comments being taken out of context, questioning the neutrality of the ETSU Report. I believe ETSU ignored its own policies and believe Anthony was not treated fairly from the onset.

Sincerely,

*Valerie Swartz* (signature)

Valerie Swartz

State of Tennessee
Washington County

Signed before me this 29th day of March 2019
by Valerie Swartz.

*(notary signature)*

My Commission 3 April 2022

*(notary seal: JAMIE LEE CARDEN, STATE OF TENNESSEE, NOTARY PUBLIC, WASHINGTON COUNTY)*

Affidavit of: *Valerie Swartz*  Signature: *Valerie Swartz*  Date:

# EXHIBIT D

**Report on the Title IX Matter involving Masino and** [REDACTED]

**Prepared by:**   **Ryan Johnson, PhD**

**To:**   **Don Mason, Attorney at Law**

**Date:**   **4/23/2019**

### Biographical information

I am a tenured, associate professor at Wofford College, with over 20 years of experience in the academy and in professional practice. I hold two PhDs: one in higher education administration from the University of South Carolina, and one in accounting from Rhodes University. I also hold a master's and a bachelor's degree in accounting from Appalachian State University. I am a certified public accountant in South Carolina, and a certified fraud examiner. I have extensive educational background, training, and experience in the field of higher education, both in academic and administrative matters. In particular, I have extensive training and experience in academic policy. I am also a Title IX investigator and a Search Advocate at Wofford College. This report does not represent the views of Wofford College; rather, it is my individual interpretation of the events as they have been presented to me.

### Background

I was asked to review the Bullard report and interpret it light of my professional experiences and training. As an associate professor, I believe my direct experience with faculty members, students, the academic enterprise, institutional policy, and Title IX guidance may be helpful to the panel or panelists who will be interpreting the investigative reports and testimony. In particular, my review focused on the "Report of the External Investigation" prepared by Ms. Courtney Bullard, and dated November 10th, 2018. It is particularly useful in that it stipulates a number of undisputed facts which are of critical importance in evaluating the process and policies used to reach a finding.

### Title IX and Institutional Responsibility

The most basic responsibility of an institution in Title IX matters is the institution's prompt, equitable, and non-adversarial response to complaints. In addition, institutions have a responsibility to investigate complaints that reasonably could result in a violation of Title IX. The nature of Title IX allegations is that they often occur out of view of witnesses, and do not produce the traditional types of evidence and testimony to which one might be accustomed. Inconsistencies in testimony are not unusual, as duress and trauma are known to demonstrably affect memory. Nonetheless, Title IX matters often hinge on the timeline of events and credibility of witnesses, and in particular, the ability of investigators to triangulate testimony and develop an assessment of the credibility of participants in the process. In some cases, Title IX matters consist only of the testimony of the complainant and the respondent, so it is incumbent upon the institution with investigative responsibility to conduct proceedings which are *fundamentally fair* and which provide *due process* to complainant and respondent.

The Department of Education has provided guidance to institutions in implementing non-discriminatory policies. As with all Department of Education guidance, "student" is a general term construed to be any individual covered by Title IX, including a staff or faculty member. The guidelines also do not imply that

one class or party is entitled to greater rights than another, particularly in making a complaint. Until an investigation can be established, faculty, staff and students are entitled to the same rights.

March 13, 1997 guidance from the Office for Civil Rights stated:

> "Title IX does not make a school responsible for the actions of the harassing student, but rather for its own discrimination in failing to take immediate and appropriate steps to remedy the hostile environment once a school official knows about it. If a student is sexually harassed by a fellow student, and a school official knows about it, but does not stop it, the school is permitting an atmosphere of sexual discrimination to permeate the educational program. The school is liable for its own action, or lack of action, in response to this discrimination."

This duty to investigate covers not only claims that clearly involve Title IX, it extends to claims that reasonably could, if investigated, result in a claim. The nature of Title IX lends itself to investigation, rather than non-investigation, as it was created to be a non-adversarial, truth-seeking process. In reviewing the report, it appears that East Tennessee State University ("ETSU") did not fulfill its duty under this standard. Further, it appears that failing to uphold this standard, initially, compromised the rest of the investigation.

## Issues

My review identified a substantial number of unusual circumstances, which appear to erode the responsiveness, independence, and fairness of the related processes. I have attempted to arrange them in the order in which they apparently influenced subsequent events.

1) **ETSU policy clearly establishes that every employee is a mandatory reporter, and Masino made reports to multiple mandatory reporters prior to the complaint made by** ▮▮▮▮ Title IX also requires that the institution remains responsible for appropriately making the campus aware of these responsibilities. The excerpt reads:

   *ETSU Employee Obligations in Reporting:*

   **Information regarding any incident of sexual misconduct which is reported to any employee of ETSU must be reported to Student Affairs, Title IX Coordinator, and/or the Department of Public Safety.** *All reports of sexual misconduct will be handled in confidence to the extent allowed by law and policy. The information reported will be shared only with those university employees or others involved in the investigation and/or resolution of the complaint on a need to know basis.*

The implication of this is that Masino made substantive allegations to multiple mandatory reporters, this being the first. It is not the job of the mandatory reporter to determine credibility, make initial determinations of responsibility, or gauge worthiness of investigation. This is precisely what investigations are for. In addition, the initial determination not to investigate his reports was later used to situate Masino's complaint as retaliatory, when it was finally accepted. If his initial reports had been

accepted at the time he alleged complaints, it greatly weakens the argument advanced by ETSU that his complaint was retaliatory.

2) **ETSU had a duty to investigate the complaints initially made by Masino, beginning as early as early January, but certainly no later than February 6th of 2018. All of these predate the complaint made by ▮▮▮▮. The interaction with Perdue was sufficient to warrant an investigation, as Perdue was a mandatory reporter, and the allegations were recognized as serious enough to refer to law enforcement.**

According to the Bullard report, this complaint constitutes the earliest allegation of a potential Title IX violation in the entire record. The contentions in the record, if true, would have clearly constituted a potential violation. An excerpt in the Bullard report states:

> Mr. Perdue states that the entirety of that discussion related to possible access of Mr. Masino's client files by an ex-girlfriend. Mr. Perdue does not recall Mr. Masino providing the name of his ex-girlfriend. At this time, Mr. Perdue understood that it was suspicion and Mr. Masino wanted to verify if his suspicions were correct. Mr. Perdue states that Mr. Masino did not mention sexual harassment, stalking or other crimes and did not ask for action from the institution regarding any of these. Mr. Perdue referred Mr. Masino to Public Safety because, as police officers, they could investigate a crime and advise him on his related legal options.

The Bullard report also states that Masino sought the password of the alleged ex-girlfriend. It would be clear to any reasonable person that Masino was trying to figure out what had occurred with respect to his email account, and that his inquiry involved an individual who also had an ETSU email account. The allegation of hacking into email, by an alleged ex-girlfriend, should have at a minimum triggered formal intake into a Title IX process because it clearly involved at least two ETSU parties, with ETSU email accounts. This allegation, depending on the facts, could also involve a violation of Federal or state law. Accordingly, Masino was referred to public safety, an indication of the potential seriousness of the allegation, and lending weight to the notion that a reasonable Title IX intake and investigation was warranted.

The **February 6th meeting with Public Safety also should have triggered a Title IX intake and investigation.** As the second complaint, a pattern clearly had developed, and properly coordinated, would have raised flags that an investigation was warranted. An excerpt is below:

> allegedly accessed his email. The Incident Report from February 6th confirms that Mr. Masino did not provide a name and that the conduct complained of related to someone accessing Mr. Masino's email account without permission. Lt. Orr did some checking into the matter, but he could not tell if anything criminal occurred. Lt. Orr worked with IT, who could only tell him the date/time of the log-ins. Mr. Steve Webb, Manager of System Support in IT, confirmed that he sent an audit log to Lt. Orr on February 15, 2018.[11]

The issue here is that this is the second, or possibly third complaint made by Masino within a relatively short time frame, to a mandatory reporter. It is also deficient that the focus of the inquiry was only on violation of a statute, rather than development of a Title IX investigation and identification of potential witnesses or sources of information to shed light on the complaint.

The **February 6th meeting with Burkette, Perdue, and Masino should have triggered a Title IX intake and investigation.** As the second complaint, a pattern clearly had developed, and properly coordinated, would have raised flags that an investigation was warranted. An excerpt is below:

> According to Mr. Perdue, the subject of the February 6th meeting was that Mr. Masino was the student-supervisor of the VITA program and his ex-girlfriend wanted to participate in the program. Both Mr. Masino and Dr. Burkette described how the break-up had gone very badly and they were concerned the ex-girlfriend would "make a scene."

Again, it is clear that there was a potential problem reported by Masino, now including a third mandatory reporter. Note that the responsibility in this situation is not that mandatory reporters be "perfect" but rather that the institution train staff, faculty and students to refer matters to knowledgeable individuals as soon as possible. The entire nature of the conversation is not appropriate to Title IX. The idea that a student should be excluded from a program because of status as a faculty or staff "ex-girlfriend" is preposterous. However, these are individuals without knowledge of Title IX, attempting to resolve a situation that should have already been referred to a trained Title IX Coordinator as part of a functioning process. The student should have been able to participate in VITA, as should have Masino. This would have been an appropriate time for an individual with Title IX expertise to investigate and implement *interim measures* **to allow both to participate, and to avoid a degrading situation.** At this point, however, there still appears to be no involvement by anyone with formal Title IX responsibility. Legal counsel, unless so named, are not Title IX Coordinators as contemplated by the Office of Civil Rights.

Even more befuddling is the notation in the report that the meeting was focused on how to deal with a potential difficulty with an "ex-girlfriend" who might show up at a VITA meeting, yet Bullard's report emphasizes that Masino did not make any actionable allegations. These are inconsistent contentions. If individuals are meeting about the possibility that a run-in will occur, those parties cannot disclaim knowledge of the context of the allegations made by Masino. Burkett's comments confirm this. Those at the meeting appeared to clearly understand the issue and were acting to mitigate it, yet no investigative action had been taken, and Masino's complaint had yet to be recognized.

**Further, the police report on the 9th of February as well as Masino's request on the 10th for a meeting to talk about his ex-girlfriend's "erratic behavior" constituted a report, and should have triggered a Title IX investigation.** Having reviewed it, I find it astonishing that ETSU did not recognize the issue, as the Johnson City police laid it out quite clearly. The officer's report states:

> *"A heated verbal exchange took place at his (Masino's) front door, during which she walked into his house despite his having told her to leave. I explained to the suspect and her brother the elements of a stalking and trespassing charge and cautioned them about future behavior like this that could be grounds for such a charges (sic)."*

In addition, the police report lends credibility to Masino's reports of being "terrorized." At this point, this triangulates Masino's own contentions, and is the only corroborating evidence available at that point. A reasonable person would have taken these facts together and determined that Masino's complaint was valid enough to be investigated, and would have done so. Instead, an unusual set of events occurs in which Masino appears to be personally investigated (well outside the scope of Title IX) and warned of retaliation because his report came after ███████

**It is also irrelevant in this case whether Masino actually named the alleged ex-girlfriend in his complaints.** Many instances of impermissible conduct under Title IX, such as sexual assault, involve individuals who are not known to the complainant, or who the complainant may be afraid to name. This can be due to duress, trauma, fear of the perpetrator's ability to cause the victim reputational damage, or shame. Mandatory reporters are **not** given latitude to erode a claim's credibility because the respondent was unknown. This is because a substantive investigation can often identify witnesses or testimony which identifies the respondent. Again, this is what investigations are for.

3) **The February 12th meeting with ETSU legal counsel was not only a Title IX procedural violation, <u>it may have been retaliatory toward Masino.</u>**

Ignoring, delaying, or exhibiting deliberate indifference to a Title IX report is a form of retaliation against the complainant under Title IX guidelines. In addition, the tone of the meeting, its subject matter, and the power dynamic created by ETSU legal were all highly unusual and potentially violations of Masino's rights under Title IX. An excerpt of the Bullard report is provided:

> Mr. Kelly states that he attended the meeting and had five concerns he wanted to address with Mr. Masino. First, he wanted to make clear that the ETSU legal office was not acting as his attorney and could not give him legal advice. Second, he wanted to determine whether Mr. Masino was holding himself out as an ETSU attorney. Third, he wanted to explore whether Mr. Masino was conducting a legal practice in Tennessee while not licensed to practice in Tennessee. Fourth, he intended to present him with the email from Ms. ████ and point out that a Title IX investigation was likely. Finally, he wanted to notify Mr. Masino that his actions against the complainant going forward might be considered retaliation. Mr. Kelly told Mr. Masino that he should not contact Ms. ████, or he could be disciplined if the contact was deemed retaliatory.

> According to Mr. Perdue, Mr. Kelly led the meeting. Mr. Perdue explained that it is standard practice that when a complaint is filed against a faculty member, the ETSU legal office will meet with the faculty member and advise about the process and give warnings about illegal retaliation against the complainant.

> Mr. Masino was provided a copy of Ms. ████ February 11th email that contained her complaint allegations. Mr. Masino made numerous allegations against Ms. ████ in response. He asserted that she broke into his home over the weekend, threatened him with exposure to the bar association and to the university, and committed felony theft of his medications. Mr. Perdue's meeting notes reflect this. Addendum 7.

> Mr. Perdue stated that Mr. Masino was inconsistent in his claims against Ms. ████ therefore he did not deem them credible. For example, Mr. Masino claimed that Ms. ████ broke into his home, but the police report did not ████████████ ████ Perdue reviewed the police

Kelly's own statement shows he used the meeting, which should have been associated with a Title IX complaint, to pursue a wide range of purported investigations that were wholly unrelated. This has the effect of disarming and intimidating the individual who is being interviewed. The idea that several investigations would be wrapped into a Title IX inquiry is unprecedented. Further, to the extent that this meeting was conducted with that purpose in mind, these actions also constitute harassment and retaliation on the part of ETSU. Further evidence of the retaliatory nature could be proven if these allegations proved to be unfounded. Why is an allegation of unauthorized practice of law being purportedly investigated by the institution, and not the licensing authority? This kind of behavior is used in criminal investigation, where it is designed to create pressure on a suspect. It is completely

unacceptable in the Title IX environment, particularly when the individual has already made a complaint that has been ignored.

Finally, procedurally, the idea that Perdue made credibility determinations ("Masino was inconsistent in his claims against Ms. ███ therefore he did not deem them credible") is non-compliant with Title IX processes. Credibility is used to weigh testimony *during* an investigation, not in advance of one. Did Perdue likewise make credibility findings for all witnesses involved, weighing the evidence, having fair proceedings, and reaching a finding? Is he authorized to make such a finding? Credibility determinations are the job of investigators, not legal counsel. If Perdue was making credibility determinations, Masino's report would have to have been under investigation. This would imply that Masino's complaint predated ███, so the discussion about retaliation may have been more appropriately directed at ███, or both parties. The alternative is that Perdue is aware he should not have been making credibility determinations at all, rather, he should have simply referred the investigation and stayed out of the proceedings. Both of these contentions cannot be true. **This is a key observation. ETSU's Title IX activity in Masino's case is problematic because it lacks clarity and appears to revolve around the consistent involvement of legal counsel, not investigators and a Title IX Coordinator.** The Title IX Coordinator is only briefly mentioned in Bullard's report. This, again, is highly unusual. While certain parties can participate in Title IX as "need to know" parties, the ETSU process is not functional because the roles of investigator and coordinator are either unclear, or they have been usurped by legal counsel.

Finally, the nature of the questioning of Masino itself deserves scrutiny. On several occasions, as stipulated in Bullard's report, there are references to employees of ETSU asking Masino about personal relationships, either past or present. While questions about ███ are appropriate, the others are not. (e.g. "was this the same girlfriend as before?) **Past allegations, suggestions, rumors, or perceptions are not acceptable as evidence for a finding under Title IX guidance.** If an individual never received a finding related to those issues, those issues cannot and must not be used as a basis for future investigation, nor can they be used to question the individual's credibility. Such questions may also be illegal, or retaliatory.

4) **Tennessee Board of Regents policy does not prohibit faculty-student relationships. Rather, it "strongly discourages" them.** It seems unusual that a behavior not prohibited by policy would be the basis for action by ETSU. Further, it seems unusual that ETSU would pursue dismissal of a tenured faculty member based on an allegation of non-disclosure of such a relationship. The nature of relationships are difficult to understand and verify, particularly when they stop and start, and the suggestion that the alleged non-disclosure of a non-prohibited relationship is worthy of the extraordinary action of dismissal of a tenured faculty member is certainly an outlier. In addition, many of Masino's reports, which predated the Title IX claim, certainly could be construed as constituting disclosure of a relationship. However, what responsibility does an individual have to disclose a relationship which has ended, or has stopped and started several times? These facts should be weighed with great care given the grave stakes involved.

Conclusion

The disservice that has been done here is to both parties: Masino and ███. When institutions do not follow federal guidance, do not conduct fair and impartial investigations, either in fact or appearance, and ratify the results internally, the complainant and respondent do not get a fair result. Actions against Masino now do not benefit ███ or remove perceived barriers to her participation in programs at ETSU. I write this report with the deepest concern for both parties, and do not reject or accept any particular

claims or responsibilities they make- particularly as to their feelings or the effects these events have had on them.

What my report identifies are core breakdowns in policy and procedure which disproportionately affected Masino's right to a fundamentally fair procedure, as well as what appears to be deliberate indifference to Masino's complaints. It appears, in my judgment, to be a situation where key individuals in the Title IX process may have harbored disdain for the nature of Masino's personal, consensual, allowable relationships or beliefs. This is an ongoing problem, which the American Association of University Professors has also addressed in its numerous statements of concern around the administration of Title IX. The disdain for an individual should not impact their ability to participate in a fair process. It is imperative that Title IX investigations are conducted with the greatest care for both complainant and respondent. In my estimation, that did not happen in this case.

Our best hope for fair and just proceedings require that we check our personal views at the door, err on the side of investigating rather than not investigating, and demand that our institutions provide the type of professional process that we would want if we were a complainant or a respondent. A proper investigation, beginning with Masino's allegation, and addressing ███████ as well, would have revealed the most complete picture. The institution's failure to acknowledge Masino's complaints not only violated his procedural rights under Title IX, it also contributed to retaliatory behaviors against him, as well as further escalation of an already difficult situation for everyone involved.

Respectfully submitted,

Ryan Johnson, PhD

# EXHIBIT E

# RDS Investigations & Polygraphs
### 225 Green Street, Suite 201
### FAYETTEVILLE, NORTH CAROLINA 28301

**Ronnie D. Smith**
**North Carolina State Trooper (Retired)**
**Private Investigator #2569**
**Michael Armendariz**
**US Army Retired SGM**
Private Investigator #4335-PIA

Office Telephone:
   **910-483-0007**
Mobile Telephone:
**910-977-1835-RDS**
   910-850-0689-MA

## AFFIDAVIT OF RONNIE D. SMITH
## RDS INVESTIGATIONS

    **NOW COMES the Affiant, <u>Ronnie Dale Smith with RDS Investigations</u>, bring first duly sworn, deposes and says:**

Mr. Donald Mason, Esq.
106 E. Main Street
Kingsport, TN 37660

Re: East Tennessee State University

Dear Mr. Mason,

Thank you for your patience and cooperation as I worked to conduct a thorough, neutral review of East Tennessee State University's (ETSU) Title IX investigation, report and appeal process. My analysis is not a legal opinion and may not be used as such. This letter serves to inform you that the review is now complete, the findings of which conclude ETSU misconduct during the investigation and subsequent misconduct and obstruction by ETSU afterwards. Comparison of federal and state guidelines to procedures and techniques utilized by ETSU and subsequent investigator show a complete breakdown of fundamental standard investigatory techniques.

My findings are based on extensive background as a law enforcement (retired) officer as well as private investigator (25+ years) evaluating the written reports; party and non-party statements and depositions; evidence provided by both parties and witnesses. My experience has shown it is not uncommon to discover procedural missteps and mistakes during administrative investigations and hearings. In many instances, procedural missteps and mistakes arise when non-law enforcement trained investigators fail to insure the preservation of evidence and institute safeguards to avoid possible corruption of the investigation process.

The purpose of the review was to seek and evaluate if the investigative procedures and all relevant evidence justify the report findings of ETSU and the outside investigator. Examination of written reports; party and non-party statements and depositions; evidence provided by both parties and witnesses; pursuant to the preponderance of the evidence standard does not support ETSU nor subsequent investigator's conclusions. The examination determined by clear and convincing standard procedural misconduct by ETSU. Critique of ETSU investigative process shows considerable conflict of interest against the Respondent to which ETSU should have taken steps to insure the integrity of an impartial investigation.1 It is abundantly clear procedural misconduct by ETSU personnel has and continues to occur. The actions (more so the inactions) indicate the subsequent investigator was not an independent party capable of providing a neutral and impartial review.

Example after example, time after time, ETSU's failure to follow basic standard investigative procedures resulted in the ability of ETSU and / or the Complainant to manipulate the process against the Respondent.

<u>CONFLICT OF INTEREST</u>

The Respondent claims he was the first to notify the institution of harassment, threats, stalking and criminal acts of the Complainant. The Respondent has outlined multiple instances of responsible parties being aware of Respondent's notices prior to the Complainant filing. The Respondent claims his documented historical duties and interactions with representatives of ETSU legal counsel office created a conflict of interest resulting in a bias against the Respondent. Review findings indicate by a clear and convincing standard the appearance of a conflict of interest existed and ETSU legal counsel office had the ability to negatively impact any investigation against the Respondent. Based on the review, by a preponderance of evidence standard, a conflict of interest in fact existed which negatively impacted the investigation.

<u>PROCEDURAL MISCONDUCT</u>

---

[1] In my forty plus years of investigation experience, I have never seen such a concentrated effort to ignore relevant evidence, refusal to contact material witnesses and ignore criminal activities by the complaining party. The outside investigator's refusal to exclude material evidence and witnesses can not be justified.

2

While a conflict of interest may have existed, the conflict of interest may not have negatively impacted the investigation against the Respondent. Careful analysis must be given to each step of the investigation process under a heightened scrutiny. Information must be evaluated for survivability under intense criticism of potential conflict of interest. Review of the investigation process and appeal has discovered repeated and systematic procedural misconduct by ETSU personnel so material that the findings of ETSU and investigator should be disregarded. Examination of the multiple instances of procedural misconduct suggests focused discrediting of the Respondent to protect and block further inquiry into Complainant credibility issues. Evidence and witness statements shows a pattern of obstruction by ETSU on and off campus.

REVIEW PROCESS

In forming decisions if a potential conflict of interest may exist, one does not have to prove the conflict exists, one has to show the appearance of conflict. If the mere appearance of a conflict exists to an outside party, general duty to maintain the integrity of the investigation, warrants the removal of any potential conflicts. Ascertaining if a mere appearance of a conflict exists, it is necessary to review all available, relevant evidence, credibility of parties and witnesses.

When some of the evidence requires the evaluation of one person's word against another, federal guidelines encourage reviewers to follow guidance from the Office for Civil Rights to weigh evidence and credibility. When evaluating one person's word against another, assume if each party is telling the truth, what would be the necessary next steps to verify the credibility.

Based on the data available, ETSU failed to undertake simple investigatory measures to verify the credibility of the Respondent's claims against the Complainant. ETSU continuously sided with the Complainant, in several instances solely based on the Complainant's word, while ignoring non-party statements and evidence that contradicted and eroded the credibility of the Complainant. Too many legitimate questions were raised regarding the credibility and motivation of the Complainant as well as behavior of ETSU legal counsel personnel. My critique finds several legitimate questions raised by the Respondent are sustainable yet ETSU took measures to discredit the Respondent versus conducting simple investigation tasks. The evaluation of evidence and credibility may       take into account:

3

**Personal and Confidential**

• Detail and Consistency: The accuracy of each person's account should be compared in an attempt to evaluate honesty and consistency. The Respondent and witnesses favorable to the Respondent have been consistent with the timing and context of events. ETSU and the Complainant continue to coexist in a pattern of altering statements and evidence to explain questionable behavior and investigative techniques. ETSU policies and procedures are so poorly defined, a third party can safely assume ETSU put in place an investigative format that allows ETSU to manipulate the process as they see fit.

• Demeanor: While emotional responses vary widely, each party's reactions and behavior could be evaluated as part of a decision. Careful consideration must be given to the background of each party. Two parties may not react similar to the same set of facts. Evaluation of ETSU findings show ETSU failed to consider "what if" the party is truthful in light of the party's background. Instead, ETSU made blanket universal decision to discredit the Respondent without considering the magnitude of "what if". Abundant information existed to initiate an investigation, however, ETSU universally ignored it.

• Action Taken: The timing of a report may be considered, although either an immediate or delayed report could be reasonably explained. Pertinent facts show the Complainant filed the complaint within days of committing multiple criminal acts against the Respondent yet available data shows ETSU willfully ignored these details.

• Other Contemporaneous Evidence: Verbal or electronic communication with friends or family (and their reactions), any other form of written details, and the timing of such communications may be factors in a decision. ETSU failed mandated neutral impartial consideration must be afforded the Complainant and Respondent. Review of the investigation clearly indicates relevant information and evidence favorable to the Respondent was ignored.

Weighing the details of the allegation, the following points were persuasive to this review and conclusion. The rationale used below established the conflict of interest and procedural misconduct occurred and numerous inconsistencies undermining the Complainant ultimately results in a finding of insufficient evidence against the Respondent:

• Taking into account possible effects that trauma or medication may have had on the Complainant or Respondent, there were numerous inconsistencies in the Complainant's account of the events that occurred before, during and after the

4

alleged incident. By way of contrast, the Respondent and multiple witnesses' accounts of the events remained consistent over all of the interviews, including the first time the Respondent was questioned about the incident without advanced warning of the investigation.

· The Complainant provided inconsistent statements about events and timeline. ETSU's failure to record interviews with all parties and witnesses can only be described as calculated. ETSU took proactive measures to assist the Complainant by sharing Respondent information and evidence, allowing the Complainant to fix inconsistent statements.

For these reasons, my assessment does not support ETSU's findings against the Respondent as the integrity of the investigation is beyond problematic based on the behavior and conduct of ETSU personnel. If a party were to evaluate the report based solely on the totality of evidence, witness statements, etc., ignoring any potential conflict of interest and investigatory misdeeds of ETSU, it is unreasonable to believe the party could support the findings of ETSU. Therefore, ETSU personnel knew or should have known their behavior was improper, creating a hostile environment for the Respondent as well as the Complainant.

The attached exhibit outlines standard investigation process and safeguards considered fundamental to the integrity of any academic investigation. In comparison, ETSU consistently failed to follow industry respected minimum safeguards of a standard investigation.

Sincerely

RDS Investigations, LLC

Case 2:20-cv-00167-TAV-CRW   Document 1-1   Filed 07/31/20   Page 30 of 39   PageID #: 67

## STANDARD INVESTIGATION PROCESS

**I. INTAKE**
□ Complainant makes a report or notifies responsible party. Interim remedies are offered, and retaliation is explained.
□ Initial assessment (i.e. interview with Complainant or written summary from Complainant) to determine if threshold is met for further investigation and adjudication.
□ If threshold is met, Complainant and/or College decides to proceed with a complaint.
□ If the threshold not met, Complainant can appeal decision.

**II. NOTICE OF INVESTIGATION**
□ Complainant and Respondent are notified of mutual "no-contact" notices.
□ Respondent and Complainant are notified of investigation by Notice of Investigation letter, which includes a summary of the issue, charge(s) being alleged, and a request for an interview with investigators; failure of Respondent to participate or respond will not delay the process
□ Complainant and Respondent receive requests from investigators for a meeting at which the parties tell their narrative of the incident(s) and are asked to provide witness names and exhibits/evidence; both parties are reminded that retaliation is prohibited; both are reminded of support resources and the right to a support person of their choice.

**III. INVESTIGATION PROCESS**
□ The College will outline the investigation process, rights of parties, and confidentiality of disclosures.  □ The investigators will interview the Complainant who is allowed to have a support person of their choice present.
□ The investigators will gather all pertinent evidence from the Complainant.  The Complainant may submit additional new evidence that previously was not available at the time first evidence submission.  The Complainant may not view or be advised of Respondent evidence.
□ The investigators will inform the Complainant and witnesses they should refrain from contact and if contact occurs, refrain from discussing the investigation or parties.  Continued discussions of the investigation or parties during the investigation by the Complainant and witnesses may jeopardize the integrity of the investigation.
□ The investigators will interview the Respondent who is allowed to have a support person of their choice present.
□ The investigators will gather all pertinent evidence from the Respondent.  The Respondent may submit additional new evidence that previously was not available at the time first

6

evidence submission or evidence in response to witness statements / evidence.

□ The investigators will interview relevant witnesses who are allowed to have a support person of their choice present.

□ Audio recordings will be made during all interviews; transcripts of the interviews are exhibits in the investigation report; the transcripts are reviewed by the Complainant and Respondent, but not edited.

□ Complainant, Respondent, and witnesses are asked to provide any correspondence and other evidence that relates to the case.

□ Draft Investigative Report and supplemental materials are made available to both parties prior to finalization.


## IV. INVESTIGAION REPORT

□ At the conclusion of the investigation, the investigators will prepare a report setting forth the facts gathered pulling directly from the interview summaries, including capturing verbatim quotes.

□ The Report should outline relevant areas of agreement and disagreement and highlight key information to the credibility of both the Complainant and Respondent.

□ The Report should reference all policies applicable (at time of event and currently) and include relevant definitions.

□ The Report will be shared with the Complainant and Respondent, who may have the opportunity to prepare and submit a written response.

□ The final investigation report should include a detailed and neutral recitation of the investigation.

□ The Report should identify all parties contacted, those parties who were interviewed, the medium of the interview (in person, telephone, email), dates of the interviews, including the time the interview began and concluded.

□ List any other information and evidence collected and date of collection.

□ Where applicable, explain reasons for unsuccessful attempts to interview witnesses or failure to collect pieces of evidence.

□ The Report includes:

• Alleged charge(s)
• Complainant interview summary/summaries and transcript
• Respondent interview summary/summaries and transcript
• Witness interview summaries and transcripts, if any
• Exhibits and evidence


## V. REPORT FEEDBACK

7

**Personal and Confidential**

□ The Report is sent to both Complainant and Respondent. Written response from the Complainant and Respondent are due in ten business days (this period may be adjusted based on extenuating circumstances).
□ The Report provides a final opportunity for the Respondent to name additional witnesses or submit additional exhibits.
□ Adjudication may be delayed if additional investigation is necessary.
□ The Report includes all summaries, addenda, transcripts, exhibits plus responses.
□ The Report is sent to Complainant, Respondent, and Adjudicator ten or more business days before the adjudication meeting.

## VI. ADJUDICATION MEETING
□ The Adjudicator meets with members of the investigative team.
□ Meetings are scheduled with each party (separately). The meeting typically takes between 60-120 minutes.
□ Complainant may bring a support person of their choice to meet with the adjudicator.
□ Respondent may bring a support person of their choice to meet with the adjudicator.
□ Meetings in person are the preferred method, however video-conference may be used when necessary.
□ The meeting with the adjudicator is audio recorded and the recording is kept in conduct file.
□ Both parties can bring Impact/Mitigation Statements with their suggestions for the appropriate outcomes.
□ Both parties are given the opportunity to listen to the other party's meeting with the Adjudicator and are given three business days to raise questions to the Adjudicator before they begin deliberation.
□ The Adjudicator sends Case Opinion within five business days of the last adjudication meeting.

## VII. NOTICE OF OUTCOME
□ Notice of Outcome letter is sent to Respondent and Complainant concurrently within two business days of receiving Case Opinion.
□ The Notice includes findings of responsibility on charges, rationale from Case Opinion, educational outcomes, and appeal process procedures (including deadlines).

## VII. FINAL APPEAL
□ Appeals are due within five business days of Notice of Outcome to the designee.
□ An appeal starts a new time clock and extends the process.

8

□ Both or either Complainant and Respondent can appeal on two grounds: new information or procedural error or misconduct.
□ The Appeal Officer or designee will accept or deny the appeal within five business days of receipt of the appeal.
□ If accepted, the other party(ies) to the case are given the opportunity to respond within five business days of acceptance of the appeal.
□ The Appeal officer or designee will make a decision within ten business days of receiving responses to the appeal.
□ Appeal decision is final.

**FURTHER, THE AFFIANT SAYETH NAUGHT**
This the _15_ day of _January_ .

_____
Ronnie D. Smith/ RDS Investigations
**STATE OF NORTH CAROLINA**

**COUNTY OF CUMBERLAND**
I _Katie C. Roddy_ , a notary public of _Cumberland_ County, North Carolina,
Certify that _____ _Ronnie D. Smith_ _____ personally
appeared before me this day, first being sworn, and executed the forgoing instrument.

Witness my hand and official seal,
_Katie C. Roddy_ (SS)
NOTARY PUBLIC

My commission expires: _2-16-2020_



KATIE C RODDY
NOTARY
PUBLIC
CUMBERLAND COUNTY, NC

9
**Personal and Confidential**

10

# EXHIBIT F

## Affidavit of Donald E. Spurrell

My name is Donald E. Spurrell, I am resident of Washington County, TN and provide this affidavit of my own fruition free of duress. I am a member of the Tennessee bar in good standing and I regularly practice before the United States District Court at Greeneville.

After reviewing the *Bullard* report regarding the ETSU investigation of Dr. Anthony Masino, there are a number of points of concern I am compelled to address.

On February 16th 2018, I met with Dr. Masino regarding his concern about the behavior of ETSU legal counsel office toward him regarding some allegations made against him by Ms. ██████. Dr. Masino advised me that he adamantly denied any inappropriate behavior toward Ms. ██████. At this same time, he reported advising ETSU Legal of various highly inappropriate and factually verifiable behaviors of ██████ towards him, including harassment, threats, stalking, computer hacking and a disturbing forced intrusion of his home.

Dr. Masino advised me that in his discussions with Ed Kelly and Troy Perdue of ETSU Legal, he was advised that based upon some allegations of ██████ that he could, "resign or be fired." He reported further that Perdue and Kelly remarked that if Masino attempted to obtain a restraining order against ██████ that ETSU would deem this conduct retaliatory and he would be terminated for this.

This sounded like a potential client exaggeration, and having known Ed Kelly for many years and holding him in high regard, I sought a lunch engagement with him in an effort to try to gauge the temperature of the matter. Mr. Kelly and I met at Tomy Thai Restaurant in Johnson City on or about the week of February 19th. During that conversation I was taken aback by the certitude from Mr. Kelly that he would be recommending tenure termination to Dr. Nolan, the ETSU president. He also informed me that ETSU would deem

legal action by Masino against ▮ to be considered retaliation. Incredulous that a concrete conclusion had been so hurriedly reached by counsel, I kept very calm throughout the meeting, as did Kelly. I tried to claw my way into any negotiating position, but there was no ground given or suggested by Kelly. Resign or be fired.

Mr. Kelly also provided me with a laundry list of other infractions or areas of concern that ETSU was investigating about Masino. We debated some of these matters in a friendly manner. They included, allegations that Masino was conducting legal business in Tennessee from his offices at ETSU; and that his relationship with ▮ was non-consensual or tantamount to sexual harassment. To this I advised Kelly of emails, cards, sexually suggestive photos and love letters that would negate such a presumption. I was surprised that Kelly would be so quick to dispense with an objective evaluation of the credibility of Masino, a father with sole custody of three well-taken-care-of children vs. a woman who engaged in repeated verifiable incidences evidencing a jealous and angry reaction to the break-up of an obviously consensual relationship. Kelly was unmoved and retorted that Masino was a serial student dater and had been a problem for a long time. This seemed very strange to me because Kelly also reported that Noland liked Masino and that he was not inclined to fire Masino. My clear impression was that Kelly could not be moved by any set of facts concerning the actions of Ms. ▮ toward Masino and that an element of personal animus was informing his opinion of Masino. Kelly never told me such personal animus existed, but it was apparent to me.

We then talked at length about the due process requirements and procedures of tenure termination proceedings. He promised me that extensive due process protections existed and that Masino would be given a full opportunity at a hearing to bring forth evidence and testimony in support of his position. The outcome of a termination proceedings was left in question, but the certainty of a termination recommendation by Kelly was not. In the end, Kelly suggested that some exit details could be subject to negotiation/mediation, but

nothing beyond this.

After this meeting I was instructed that Lisa Williams would be conducting the Title IX investigation in Masino/█████ In my subsequent meetings with Williams she reiterated that no negotiation appeared to exist concerning the termination of Dr. Masino and that if Masino sought a restraining order or other legal actions against █████ he would be terminated for that reason.

Dr. Masino was concerned with bullying and threats made by Ed Kelly and Troy Perdue. Dr. Masino disclosed he previously notified the ETSU legal counsel office to ms. █████ harassment, threats and unauthorized access yet ETSU legal counsel was denying his previous notice. Dr. Masino was concerned prejudice by ETSU legal counsel office.

Further Deponent Sayeth Not.

<u>OATH</u>

_____

Donald E. Spurrell

STATE OF TENNESSEE

COUNTY OF WASHINGTON

Before me personally appeared Donald E. Spurrell and acknowledged his execution of this affidavit.

WITNESS my hand and Notary Seal this 11th day of December 2018

Marlene J. Vance, Notary Public
My commission expires 11/6/2021